## BARRETT COMPANY *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 105.   Submitted January 7, 1927.—Decided February 21, 1927.

1. After cancellation of a contract under which supplies were to be manufactured for the Government in a plant to be built with government funds and to belong to the Government, the making of a supplemental agreement by which the contractor bought the plant for a price stated did not affect the contractor's claims growing out of the termination of the original contract, when the later agreement was expressly without prejudice to them.   P. 232.

2. The just compensation to which a claimant is entitled upon cancellation of a contract by the Government, under the Act of June 15, 1917, is not to be measured by the profit that would have accrued under the contract, but must embrace that value which was taken from the contractor by the termination of the contract. The contractor is to be credited with his outlays reasonably made for the fulfillment of the contract.   P. 235.

3. In this case, where the obligation of the contractor was to manufacture and furnish to the Government a definite quantity of xylol monthly, up to a specified amount, in a plant which was to be erected by the contractor with government funds and belong to the Government, just compensation, upon cancellation of the contract, must include what the contractor expended on the plant in excess of the cost as estimated and adopted in the contract and paid by the Government, in so far as such additional expenditure was required to fit the plant for production of the xylol as the contract contemplated. P. 234.

60 Ct. Cls. 343, reversed.

APPEAL from a judgment of the Court of Claims in an action to recover under an agreement with the Government for the manufacture of xylol.

*Messrs. George A. King* and *William B. King,* with whom *Mr. Francis H. McAdoo* was on the brief, for the appellant, submitted.

*Solicitor General Mitchell* for the United States, submitted.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This is an appeal from the Court of Claims under §§ 242 and 243 of the Judicial Code from a judgment of February 16, 1925, before the effective date of the Act of February 13, 1925, § 14, c. 229, 43 Stat. 936.

The findings of fact by the Court of Claims show that the Barrett Company, the claimant and appellant, a corporation under the laws of New Jersey, entered into a contract with the United States by which it undertook, with funds provided by the Government, to erect a plant at Frankford, Pennsylvania, for the distillation of xylol at the rate of 225,000 gallons per month, and, after completion, to operate the plant until a total of 2,700,000 gallons of xylol had been produced. The xylol was to be distilled and refined from special solvent naphtha fur-

nished by the Government, and was at all times to belong to the Navy. The by-products, except what the Navy wished to retain, were to belong to the Barrett Company as part of its profit, but not to be sold without the Navy's written consent. Ninety per cent. of the by-products sold by the company was to be credited to the account of the Navy, less one cent a gallon for rental of containers used for shipment.

The price to be paid by the Navy to the company was to be determined monthly for the preceding month by the actual deliveries, first, by a charge per gallon of xylol prorating the total approved estimated cost of the new plant against the 2,700,000 gallons to be made under the contract. At the same time, the account of the Navy was to be credited with this charge, as the total approved estimated cost would have been advanced by the United States to the company before the production of the xylol would begin. To cover operating cost, there was to be a charge of 3 cents per gallon of naphtha distilled, and an additional charge for redistillation of fractions. These charges were to be multiplied by the gallons of naphtha distilled, and the resulting aggregate was to be divided by the number of gallons produced monthly, to which 6.6 cents per gallon was to be added to cover overhead, profit and use of patents.

The new plant was to be an annex to the appellant's existing distillation plant and equipment. The estimated cost to be furnished by the Government, was to be exhibited to the authorities of the Navy Department for approval, prior to the execution of the contract, and was to consist of two parts. First, there was to be an itemized estimate to cover the cost of the separate unit plant and equipment, and, second, an itemized estimate to cover the cost of parts of the plant and equipment needed for the supply of electric power, steam, water, and light, which would not be distinctly separate from the existing

plant and equipment of the company. One-half of the sum to be advanced for construction was to be paid by the Government at the time of the execution of the contract, and the balance in two months. Plant and equipment were to be ready for operation within five months from the date of the contract, and to be continued in operation until the company had delivered the full amount of 2,700,000 gallons of xylol to E. I. du Pont de Nemours and Company. The xylol provided for in the contract was to be employed in the manufacture of trinitroxylol, for use in mine barrage in the North Sea, and was a new product requiring knowledge and skill in its manufacture. The plant, when completed, was to belong to the Government. The company agreed to offer and to pay 25 per cent. of the approved estimated cost for it if accepted, after the contract was performed; but the Government could dispose of it as it chose.

It was stipulated in the contract that the Barrett Company should furnish a bond for the faithful performance of the contract, equal to the approved estimate of the cost of construction; that time was an essential element in the contract; that, by failure to make delivery in conformity with the requirements of the contract and within the times prescribed, the United States would be damaged; that the damage should be liquidated for each day's delay at the rate of a certain per cent. of the contract price; and that legal excuse for delays was to be determined by the United States.

The company's estimate for the separate unit and equipment was $192,547.80, and that for the plant for supplying electric power, steam, water and light was $60,-773.32,—a total of $253,321.12. These estimates were approved by the Navy Department, and one-half of the cost, $126,660.56 was advanced to the plaintiff on the execution of the contract, and the remainder was paid two months thereafter.

On May 18th, 1918, the Navy Department gave notice to the company that it might proceed immediately upon the construction of the plant. It did so, and completed the separate plant at a cost of $284,882.66. The electric, steam, water and light plant had been, at the time of the armistice, about half constructed, at a cost of $52,897.53. The total expenditure on plant and equipment, by the company, was thus $337,780.19, or $84,459 more than the estimates submitted by the plaintiff. The increased cost of construction was due to the increases in the cost of labor and materials, and to a change in construction from steel and brick to reinforced concrete and brick, due to inability to secure steel, and to certain changes in the tanks as originally proposed, in order to increase their capacity. None of these changes was either directly authorized or approved by the Navy Department; but it does appear that the Department had knowledge of the changes and made no objection thereto.

After the armistice, November 18, 1918, the Navy Department notified the plaintiff that the manufacture of xylol under the contract should be discontinued; that construction work remaining to be completed under the contract would not be undertaken, and that the fact that the Navy would receive a partly finished plant would be considered in the final adjustment to be made with regard to the contract. The Navy thereafter discontinued further supply of naphtha, and work under the contract was terminated.

The Navy Department, on December 1, 1918, made a supplementary agreement with the company, by which the company bought the whole plant for $110,000. This supplemental contract contained the following: " It is further agreed that this supplementary contract does not prejudice the right of the contractor to secure payment of claims in settlement for the termination of the original contract No. 38925 by the Government."

From the xylol produced and delivered for three months, the company made a profit of $7,195.59. It was testified by accountants that the profits to the company on the undelivered part would have been $73,792.66, and that its profits from the future by-products would have been $8,237; but these results were uncertain and problematical.

The Court of Claims allowed four items claimed by the appellant, amounting in all to $10,995.08, and for this amount gave judgment.

The statute under which this contract was cancelled by authority of the President, and under which this suit was brought, provides that " whenever the United States shall cancel, suspend or requisition any contract . . . it shall make just compensation therefor to be determined by the President," and, if the amount determined by him is unsatisfactory to the claimant, he may sue the Government to recover such sum as, added to that which he may have already received, will be just compensation therefor. Act of June 15, 1917, c. 29, 40 Stat. 183.

The appellant makes but three assignments of error.

1. That the court held that the supplemental contract of December 1, 1920, was a bar to reimbursement of claimant for expenditures in connection with the erection of the plant.

2. That it failed to allow claimant as just compensation for cancellation $84,459.07 expended for construction of plant over and above the approved estimate.

3. That it did not allow interest on the sum included in the judgment.

First. The Court of Claims seems to have held that the supplemental contract by which the company purchased the plant for $110,000 operated as a final settlement of all claims it had against the Government. In its opinion, speaking of the purchase, it said:

" In many respects, this transaction alone would be sufficient to preclude recovery claimed for this item of

loss; it was a final adjustment of losses with respect to this particular controversy."

We are unable to see that the supplemental agreement could have any such effect, in view of the specific clause of the supplemental contract stipulating that the claims of the contractor should not be prejudiced thereby.

Second. The Solicitor General tenders to the Court the opinion of the Court of Claims, and an extract from the brief of the United States in that court, to show the argument there made against including in the recovery of the plaintiff, as part of just compensation, the amount expended by it in excess of the estimate it made for the cost of the plants to be erected. The Solicitor General, however, finds himself obliged to assist the Court (and in this we think he is to be commended) in presenting a view adverse to the conclusion of the Court of Claims and to the contention of the United States in that court.

The Court of Claims in its opinion said upon this point:

"It is true the plaintiff, because of emergency conditions, determined to go beyond its express warrant of authority and incur added expense in the construction of the desired plant, but the contract itself contemplated no such increased expense, and there were manifestly no contractual obligations imposed upon the plaintiff to do what it did do. But, says the plaintiff, except for the exercise of the right of termination, the additional expense of construction would have been amortized in the total profits received upon completion, and therefore becomes a sum indispensably necessary to make the plaintiff whole. Apparently, a sufficient answer is the assumption of such a risk by the plaintiff. The right to terminate under the statute was part of the contract, and an unauthorized expense incurred depended for reimbursement upon the contingency of its exercise. What the plaintiff did, over and above the limitations of its contractual obligations and rights, it did of its own free will

and assumed the hazards of recouping the same out of its final profits, in the event the contract proceeded to conclusion. It is not asserted that the contract supports the plaintiff's contention. The contention is predicated entirely upon the theory of just compensation. We have been unable to resolve the issue in plaintiff's favor. The just compensation to which the plaintiff is entitled, under the cases heretofore considered by the court, is limited to the stipulations of the contract, which by its terms imposed obligations and reciprocal rights and privileges upon the parties to the contract. The contract fixed the status of the parties thereunder. If one goes beyond its terms it is difficult to perceive how financial obligations to pay more than is agreed to be paid can be inferred on the single theory that the defendant in the exercise of a lawful right terminated all further proceedings under the same and is held thereafter to account for no more than just compensation. In view of the cases cited the just compensation to be awarded must be a loss lawfully resulting from a performance of the contract according to its terms, and may not embrace one occasioned by the contractor's departure from the contract, although considered by the contractor at the time as expedient and in promotion of the rapid completion of the whole contract."

We can not concur in this view of the effect of cancellation, under the circumstances and the terms of the contract. We think, with the Solicitor General, that the provisions for the construction of the plant and the production and payment for the product and the disposition of the by-products are all to be construed together as one contract. The main obligation of the Company, and the chief purpose of the contract, was to furnish to the Government 2,700,000 gallons of xylol at 225,000 gallons monthly. All else was incidental and ancillary to that. It was obliged to distill 225,000 gallons monthly in the months required. The money to be advanced by

the Government was doubtless an indispensable aid to the company's fulfillment of its contract. The estimates limiting the amount were in the interest of the Government. But the possibility that the estimates might not furnish a plant of sufficient capacity to do the work within the time mentioned did not relieve the company; and if it thought a larger expenditure necessary for this, it must make it. Just compensation for cancelling the contract requires that the contractor shall be made whole and recover the expenditures necessary to perform the contract. It would have been no defense, had the company failed to perform and the Government had sued for a breach, that the plant erected upon the estimate was not sufficient to do what was agreed. That was the contractor's risk.

The contract in fixing the elements of the price per gallon of xylol speaks of adding 6.6 cents to cover overhead, profit and use of patents; but we are not concerned with profits in this case. *Russell Motor Car Company* v. *United States,* 261 U. S. 514; *College Point Boat Corporation* v. *United States,* 267 U. S. 12.

What the company is entitled to is just compensation for the contract which was taken from it, and under the cases just cited it should certainly be credited with the outlay which it can show there was reasonable ground for making in order to fulfill its engagements. On the other hand, the Government may show, without regard to the estimates, that the actual additional expenditures were really not required for the fulfillment of the contract, or if less than what was spent was needed, then how much less. The case must be remanded for new evidence and new findings on this issue.

The other assignment of error is to the failure of the Court of Claims to allow interest on that which was or should be recovered. In support of this assignment of error, the appellant contends that, as prospective profits

can not be calculated as part of the recovery in a cancellation case, and as just compensation, under the decision in the *Seaboard Air Line* case, 261 U. S. 299, must include interest on the amount due from the time of cancellation, interest must be allowed here. The Government argues that, as this contract was made after the power of cancellation was given by the statute, its provision for the cancellation must be regarded as written into the contract, *Russell Motor Car Company* v. *United States*, 261 U. S. 514; *College Point Boat Corporation* v. *United States*, 267 U. S. 12; that, when so written in, cancellation is part of the risk run under the contract, and, therefore, that interest on the amount due under the contract can not be collected, because of lack of specific agreement for it under § 177 of the Judicial Code. This exact point has never been decided by the Court. Several especially set cases are now pending in which this is the sole issue raised. As the case must go back for further consideration, we prefer to leave the point undecided and to await the argument in those cases, which will probably be disposed of before the issue here will be ready for further consideration by the Court of Claims in this case.

The judgment of the Court of Claims is reversed and remanded for further proceedings.

*Reversed.*