LittletoN, Judge,
dissenting in part:
It appears to me that we would be justified in finding that the market value of the raw beef on hand at the time of cancellation of the contract in question was not in excess *597 of the value per pound for which the plaintiff gave the United States credit. I am of the opinion, however, that the defendant correctly contends that since the plaintiff, instead of selling the beef in the state in which it was at the date of cancellation of the contract, retained it and converted it into sausage, steak, corned beef, and hash for domestic sale and consumption, it can not recover without showing that a loss was finally sustained. Since the plaintiff retained the product, which the defendant had contracted to purchase, its loss would' be the difference between the cost of the raw beef plus the cost of converting it and the price at which it was sold. No evidence at all was submitted upon this point.
By the Reporter:
On June 6, 1932, the court entered the following order:
“ It is ordered by the court that the judgment heretofore entered be set aside and held for naught, that a new trial be granted, and upon such new trial it is ordered that the findings heretofore made be changed as follows:
“ (1) That the first two paragraphs of Finding III be stricken out and in lieu thereof the following inserted:
“‘III. The plaintiff had on hand January 25, 1919, the date of the receipt of the notice of cancellation, over and above what was necessary to fill the allotments for January and February, 1919, 149,699 pounds of boneless carcass beef, 14,979 pounds of boneless beef chuck, 55,641 pounds of beef trimmings, and 16,216 pounds of beef flanks, which cost $47,448.92. Subsequently this beef was used in the manufacture for domestic sale and consumption of Vienna sausage hamburg steak, corned beef, corned beef hash, and sausage meat, and prior to July, 1919, was sold by plaintiff. All of these weights are subject to shrinkage of 1.7 per cent on account of the meat having been kept in cold storage.
“ ‘ The evidence shows that at the time of the cancellation of the order there was practically no demand for the kind of beef which was used for filling the orders given plaintiff and that the prices thereof were greatly depressed.
“ ‘ The market value of said raw beef at the date of the cancellation of the contract, or within a reasonable time thereafter, was not in excess of 10 cents per pound for the boneless carcass beef and the boneless beef chuck, not in excess of 9 cents per pound for the beef trimmings, and not in excess of 8 cents per pound for the beef flanks.’
“ (2) That the second paragraph of Finding IV be stricken out and in lieu thereof the following inserted:
*598 “ ‘ The evidence shows that at the time of the cancellation of the order the market value of the canned beef described in the previous paragraph was at least $1,528.90 less than the cost to plaintiff of the materials used to produce it.’ ”
The court thereupon gave judgment for plaintiff in the sum of $29,904.84.
OPINION ON MOTION POE NEW TBIAL
Gbeen, Judge,
delivered the opinion of the court:
The plaintiff has filed a motion to change the findings and for a new trial. The case is one in which the evidence showed that the Government had, while the war was going on, ordered a large quantity of canned meat from the plaintiff. When hostilities suddenly ended the Government canceled its contract. The plaintiff by this action sought to recover damages sustained by reason of this cancellation.
At the outset it ought to be said that the equities of the case are strongly with the plaintiff. In good faith it accepted an order from the Government, bought the meat required to fill it, and had partially manufactured this meat into the product required by the Government when it received notice of the cancellation of the contract. Immediately the bottom practically dropped out of the market for raw meat of the quality used in the contract and for canned meat of the description required by the contract. To this demoralization of the market the Government contributed by throwing large quantities of such articles on the market to be sold for whatever could be obtained.
Nevertheless, so far as it is disclosed by the evidence, the Government thereafter proceeded as if the plaintiff had no claim against it, and its officials have ever since resisted the allowance of any sum on account of damages sustained. Under the circumstances, the case of the defendant does not commend itself to the court. There has not at any time been any question but that the plaintiff sustained substantial damages by reason of the cancellation of the contract, but when the case was originally submitted we were of the opinion that the evidence was insufficient to show the amount thereof. Our attention has also been called to a decision of *599 this court which is not in entire accord with some things that were said in the former opinion.
The motion for new trial involves a reconsideration of the testimony. The evidence shows without dispute that the plaintiff had on hand on January 25, 1919, when the contract was canceled, and for some considerable time thereafter, 236,535 pounds of raw beef which had been purchased for the purpose of filling the contract made with the defendant. We have carefully gone over the evidence again in detail and have concluded that in fixing the value of this raw beef on the former submission of the case too much weight was given the testimony of the defendant and too little given to the testimony offered by the plaintiff. Frederick G. Baker, the principal witness for the plaintiff on this point, was the president, treasurer, and general manager of the plaintiff corporation, and as such had had charge of the buying of raw beef for use in plaintiff’s operations. He testified that he had been actively engaged in the buying of canning beef for twenty years and was familiar with the market for such beef; that on the basis of his knowledge thereof and experience, the market value of the meat involved herein at the date of cancellation and up to March 31, 1919, was ten cents per pound for the boneless carcass beef and the boneless beef chuck, nine cents per pound for the beef trimmings, and eight cents per pound for the beef flanks; that after that date prices were lower if anything because the Government contracts had been completed and the Government itself was in the market selling its canned meats in competition with the packers. As against this evidence the defendant offered testimony of two witnesses, Charles F. Easier and Walter C. Davis, the latter being assistant chief marketing specialist of the Department of Agriculture, who testified to certain quotations in the National Provisioner (a trade paper) during the period from January to June, 1919. Neither of these witnesses, however, testified to any sales of similar beef during that period. In view of the other testimony with reference to the demoralization of the market for raw beef at that time, which in fact must necessarily have existed in view of the fact that an enormous amount had been purchased for the Government which, *600 when the Government had no use for it,'must be thrown upon the market and presumably sold for whatever could be obtained therefor, we have come to the conclusion that these quotations in the trade journal were merely formal and perfunctory and could not have been based on any actual sales at the prices stated therein. The testimony given by plaintiff’s witness is, it is true, only his opinion, but in view of the fact that he was an expert of twenty years’ experience and under the particular circumstances of the case would be likely to know as much about the market as anyone, we conclude that his testimony is not overcome by what we consider entirely unreliable quotations found in a trade journal. Accepting the testimony of the plaintiff’s witness as the more reliable and trustworthy, we find that the market value at the time in question of the boneless carcass beef was ten cents per pound, of the boneless beef chuck ten cents per pound, of the beef trimmings nine cents per pound, of the beef flanks eight cents per pound, and that allowance should be made in each case for a shrinkage of 1.7 per cent in weight.
It is contended on behalf of the defendant that no recovery can be had in the case because the plaintiff converted the raw beef into articles different from canned roast beef, Avhich had been ordered by defendant; that the identity of the product was destroyed, and the plaintiff can not now prove the amount of its loss. The same situation is said to prevail with reference to certain cans of roast beef which were opened and their contents distributed. The plaintiff, on the other hand, contends that it was entitled to use the beef on charging itself with the fair market value thereof; and, with reference to the cans which were oisened and the contents distributed, it calls the attention of the court to the testimony which shows that this particular part of the product could not be sold in cans of the size in which it had been put up.
On the former submission we sustained the contention of the defendant in this respect and noted that the evidence failed to show that a loss resulted from the conversion of this meat into other materials. On reconsideration we *601 have reached a different conclusion both with reference to the facts and the law.
Whether, under ordinary circumstances, it would be necessary to obtain permission from defendant to take over the meat at a fair market price and convert it into something that was salable we do not find necessary to decide. Plaintiff received instructions from General Kniskern, the officer in charge for defendant, “to use every effort to dispose of such material as you may now have on hand in order that adjustment may be quickly made,” and that “ it will not be necessary to communicate with this office either in person or by correspondence with a view to making any arrangements other than those outlined herein.” The testimony also shows that at a meeting with the representatives of the Government in April, Major Sidles and Captain Shugert, of the Quartermaster Corps, told Baker, in substance, that his company should dispose of these materials, finished goods, and other supplies in order to minimize the loss. The market for raw beef and canned roast beef at that time was so unreliable that we are justified in concluding that there was so little demand for it that it would have been very difficult to make a sale at any price. The testimony shows that contractors who had formerly been buyers in order to fill their contracts had to turn sellers. The instructions received from the defendant were to minimize the loss. It may be that a sale was contemplated, but we think that, taking into consideration the condition of the market, the loss to the Government was less than it would have been if the product had been thrown on the market and sold for whatever could be obtained. Apparently there was sale for the converted product, although its price also must have been affected by general market conditions.
We think also under the instructions received from the defendant and the holdings of this court in other similar cases, plaintiff was not bound to obtain the permission of defendant before taking over the property for itself at the market price. It had on hand a perishable product with which something had to be done, and the necessity for quick action was such that the Government officials had notified plaintiff that it was not necessary to communicate with *602 them on this subject. In the case of Harrisburg Pipe Co. v. United States, 67 C. Cls. 138, the same argument was advanced to prevent plaintiff’s recovery. In that case it appeared that plaintiff had on hand at the date of the cancellation of its contract with the defendant certain pig iron and other supplies purchased for use in completing the contract, and the court said (p. 151) :
“ Defendant contends that because plaintiff kept the pig iron, manganese, and other supplies, and consumed them in its operations on other contracts during the year 1919 and thereafter, there is no showing that plaintiff lost anything by reason of the purchase of these materials.”
The court, on the authority of Barrett Company v. United States, 273 U. S. 227, held that this position was not well taken and in substance that it was sufficient for the plaintiff to show the market value of the materials which it took over and used for its own purposes after the contract had been canceled, and that “the defendant could have no concern in the profit or loss ” which might be made or sustained through plaintiff’s subsequent use of the materials.
The rule laid down in the Harrisburg Pipe Co. case, supra, does no injustice to the defendant and can not any more than recompense the plaintiff for the damage which it unquestionably sustained.
Counsel for plaintiff cite many State cases in which it is held that in cases where the contract is executory and has been partly executed and then repudiated or canceled by the party for Avhom certain work was to be done or products furnished, the manufacturer is entitled to recover the difference between the cost of the materials purchased to fill the contract and their market value at the time of the cancellation thereof; or if the materials purchased to use in complying with the contract were used by the manufacturer, in such event the property may be resold; or in case he does not see fit to do this, he may retain the goods and account for the market price at the time of the breach by the purchaser. See Huguenot Mills v. George F. Jempson & Co., 47 S. E. (S. C.) 687. In the somewhat analogous case of the Wheeling Steel Corp. v. United States, 71 C. Cls. 571 (on motion for new trial), it appeared from the findings that the raw *603 material purchased for the completion of the contract was used by the contractor in the ordinary course of its business after the cancellation of the contract, but the plaintiff was nevertheless permitted to recover in the action.
We think the findings should be changed in accordance with our conclusions above stated to show that the market value of the raw beef at the date of cancellation, or within a reasonable time thereafter, wás not in excess of ten cents per pound for the boneless carcass beef and the boneless beef chuck, not in excess of nine cents per pound for the beef trimmings, and eight cents per pound for the beef flanks involved herein. Upon these findings the amount of plaintiff’s damages so far as the raw beef is concerned should be compared. We think also, following the views above stated, there is sufficient evidence to sustain the claim of the plaintiff for loss on the manufactured goods of $1,523.90, and the findings will be changed accordingly.
So far as the claim of the plaintiff arising from the transactions with the Krey Packing Company is concerned, we find no reason to change the findings and conclusions of law made in the former opinion.
Judgment will be rendered in favor of the plaintiff for the loss on raw canning beef of $25,063.37, together with charges incurred in connection therewith of $2,939.70, for the loss on manufactured goods of $1,523.90, and for the loss on account of cans and boxes, purchased for use in completing the contract but which had no value when the contract was canceled, of $377.87, a total of $29,904.84.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and Booth, Chief Justice, concur.