**PENN FOUNDRY & MFG. CO., Inc. v.
UNITED STATES.**

No. 46122.

Court of Claims.

Feb. 2, 1948.

David G. Bress, of Washington, D. C. (Robert H. McNeill, T. Bruce Fuller and Newmyer & Bress, all of Washington, D. C., on the briefs), for plaintiff.

Henry Weihofen, of Washington, D. C., and Herbert A. Bergson, Acting Asst. Atty. Gen., for defendant.

Before J O N E S, Chief Justice, and MADDEN, HOWELL, WHITAKER, and LITTLETON, Judges.

MADDEN, Judge.

The plaintiff is a Virginia Corporation whose principal stockholders reside in or near Pittsburgh, Pennsylvania. It has, since its incorporation in 1911, owned a manufacturing plant at Waynesboro, Virginia, consisting of six brick and stone buildings, with metal roofs, located on about six acres of ground. In 1940 the plant contained numerous large and small machine tools and accessories, which had been used very little since their acquisition by the plaintiff, but had not deteriorated to any considerable extent. The plant had been idle for some years before 1940.

Late in 1940 or early in 1941 it occurred to the officers of the plaintiff that their plant and equipment might be put to profitable use in manufacturing products for national defense. H. M. Johnson, Assistant to the President of the plaintiff com-

pany, began discussions with purchasing officials of the Navy Department with a view to obtaining a contract. In April 1941, the company submitted to the Navy a proposal for the manufacture of 500 three-inch 50-caliber anti-aircraft gun mounts. It furnished a list of equipment which it had or could obtain for the work. In July a Navy Inspector inspected the plant and talked to Mr. Gordon Kennedy, the engineer who was later to become the plaintiff's general manager. A conference was held in September, in the Navy Department, and thereafter the plaintiff was asked to furnish further information, including a detailed study of the machine-tool operations which it would use if it were awarded a contract for 150 of the gun mounts. It furnished the study, and modified slightly its previous proposals. On December 22, 1941, a meeting of representatives of the plaintiff and of the Bureaus of Ordnance and of Supplies and Accounts was held in the Navy Department, at which meeting the plaintiff's proposal was discussed and was said to be satisfactory. The plaintiff's representative was asked if it would be satisfactory for the plaintiff to endeavor to obtain a letter from a bonding company saying that it would be willing to furnish a bond to secure the performance of the contract, and replied affirmatively.

On December 29, 1941, the "letter of intent" to give the plaintiff a contract in due course, parts of which letter are quoted in Finding 4, was written. This letter was accepted by the plaintiff and returned to the Department on January 10, 1942. By a letter dated January 7, the plaintiff was advised that no expenditures under the letter of intent would be approved until the plaintiff had furnished a letter from an approved surety company containing a firm commitment to act as surety on a performance bond in the event that a contract should be executed. The letter asked that the plaintiff furnish the bonding company commitment promptly "so that work may proceed under the authority of the letter of intent." On January 29, the plaintiff was advised by letter that it had not furnished the bonding company commitment, and that failure to do so promptly might

result in the termination of the letter of intent. On February 3, the plaintiff's representative submitted to the Department a letter from a surety company saying that it would be willing to write a bond if the plaintiff's financial structure were changed in either one of two ways which were stated in the letter. The Navy Department official to whom the letter was submitted told the plaintiff's representative either that the letter was satisfactory, as testified by the plaintiff's representative, or that the letter would be taken under consideration to determine whether it was adequate, as testified by another Department official who was sitting in the same room and testified that he heard the conversation.

On February 23, 1942, the Department mailed to the plaintiff a writing, the first lines of which said in capital letters This Is Your Official Award Of Navy Contract No. LL 96553." The tenor of the paper, which is plaintiff's exhibit 9, is that it was a final award of a contract pursuant to the plaintiff's proposal. This writing was received by the plaintiff at Waynesboro in the forenoon of February 24. Later on that day the plaintiff received a telegram from the Department, which we have quoted in Finding 6, saying that the award had been forwarded in error and should be returned for cancellation.

The events recited above raise the question whether or not the Government made a contract with the plaintiff. The Government urges that the apparent closing of the contract was a nullity, because it was done by mistake. The asserted mistake was made somewhat as follows. When the letter of intent was issued on December 29, 1941, that, under Department procedure, set in motion a series of steps which would, in due course, result in the mailing of a notice of award, unless the procedure was interrupted, which it was not in this case. In the meantime, the officials who had discretion as to whether or not it would be prudent to award a contract to the plaintiff were still in doubt, and continued to ponder the question, along with the many other questions involved in their day-to-day work. They did not reach their conclusion, which was that the contract should

not be awarded, until the day after the letter awarding the contract had been mailed. They then tried to make their conclusion effective by sending the telegram of February 24.

We think that the Government made a contract with the plaintiff, and that no mistake of the kind which would vitiate a contract occurred. When the responsible officials directed their subordinates to prepare and mail to the plaintiff an acceptance of its proposal, as they did when they set the departmental procedure in motion to that end, they made no mistake. They did it after their conference of December 22 at which the plaintiff's proposal had been fully considered, and at which time they were aware of what the plaintiff had in the way of plant, equipment, management, and prospects for a labor force. There may have been many reasons why the proposal should not have been accepted, but they had had a full opportunity to investigate those reasons, and they still wished to accept it. The slow but apparently normal progress from the letter of intent on December 29 to the notice of award on February 23 gave them plenty of time to change their minds, and head off the award. They did change their minds, and by February 24 they were no longer willing to contract with the plaintiff. But the Government had already contracted with the plaintiff. Immediately thereafter, it regretted its contract, not because of any mistake as to any fact, but because, upon a more mature consideration of all the facts, the officials of the Department thought it would have been wiser not to have made the contract. There must, however, come a time when deliberation as to whether or not to make a contract ends, and the rights and obligations of the contract itself, if one is made, begin.

■ The Government's contention that the plaintiff's failure to furnish a letter from a bonding company expressing a willingness to write a performance bond, if requested, was a justification for cancelling the contract, is not valid. When the plaintiff's representative on February 3 submitted the bonding company letter to the same Navy official who later signed the notice of award, there was no legal requirement of a bond, when a contract was not let on bids, and it was natural for the plaintiff to suppose, from the fact that the official received the letter and made no further request of the plaintiff for a bond or a firmer commitment, that nothing further was expected of it. There was no legal reason why the contract could not be awarded, without any further steps in regard to a bond, and, as we have seen, it was awarded. Indeed, the Government's witnesses testified that the question of the bond was not the real reason for the cancellation of the contract, although it was represented in the Government's letter of March 5, quoted in Finding 6, as the only reason.

■ We have concluded above that the plaintiff had a contract with the Government. There is no question about the Government's breach of the contract, by refusing to permit the plaintiff to perform it. The plaintiff is, therefore, entitled to recover its damages, if any resulted from the breach. The Government urges that there were none; that the plaintiff could not have performed the contract at all, and certainly not with such efficiency as to have made a profit.

In any case of a breach of a contract the performance of which would require a long succession of activities over a considerable period of time, it is far from certain that the contractor would have made a profit if he had been permitted to perform. It could be pointed out that many contractors have, by reason of accidents, changed conditions, inflation, or other eventualities, lost money on contracts from which they hoped to profit. Yet that does not prevent courts from awarding damages for breach of such contracts, nor compel courts to suppose that loss is as probable as gain in the performance of contracts. We should, therefore, if this were the case of a company undertaking to supply its normal product, award it its normal profit as damages. Here, however, the plaintiff was venturing into an untried field, as, indeed, the Government in its emergency de-

sired companies which had idle plant and machines to do. Its production manager, Kennedy, who was highly thought of by the Government for his experience and ability, was willing to come with the plaintiff at a rather modest salary but with an arrangement whereby he was to have a percentage of the profits. This is substantial evidence that one expert who had studied the situation carefully anticipated that the performance would produce profits. The stockholders of the plaintiff, who were willing to finance performance without asking for any advance of funds from the Navy, must have anticipated that the contract would produce a profit. We think that the consideration and tolerance with which the Government, during the time here in question, treated contractors actually engaged in producing defense material, if the contractor in good faith did his best to perform, is an indication that the plaintiff, if allowed to perform, would probably have succeeded in making a profit.

On the other hand, it must be said that the plaintiff would have had problems and difficulties that an active, going concern, would not have had, and those difficulties would probably have adversely affected its profits. On the whole we can do only what a jury would do in a similar case. We conclude that the plaintiff would probably have made net profits of about 4% of the gross contract price, and we award it $80,000.

The expenses incurred by the plaintiff in repairing its buildings, fencing its property, negotiating with the Navy Department with a view to obtaining a contract, or for other purposes are not recoverable. Until the letter of intent was issued on December 29, 1941, there was no possible reason why the Government should have been responsible for any of the plaintiff's expenditures. On January 7, 1942, the plaintiff was advised that the Government would not be responsible for any expense incurred pursuant to the .letter of intent without first securing permission from the Government to make the expenditure. So short an interval elapsed between the award of the contract and its cancellation that no expense was incurred during that time.

We find no merit in that part of the plaintiff's claim relating to the taking of its machines by the Government. An offer was made for them; the plaintiff rejected the offer and accepted one-half the offered amount, preserving its rights, as the statute permitted it to do, to sue for the balance of what it claimed to be the value of the machines. 55 Stat. 742, as amended, 50 U.S.C.A. War Appendix, § 721. Many months later, the plaintiff itself offered to accept the balance of the amount originally offered, and to give a release upon payment. This was done. The money was paid to and retained or used by the plaintiff. The circumstances in no way suggest duress, and the plaintiff is bound by its release.

The plaintiff is entitled to recover $80,000. It is so ordered.

JONES, Chief Justice, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.