## UNITED STATES *v.* PENN FOUNDRY & MANU-FACTURING CO., INC.

No. 253.   Argued January 7, 10, 1949.—Decided May 31, 1949.

*Melvin Richter* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison* and *Paul A. Sweeney.*

*Robert H. McNeill* and *David G. Bress* argued the cause for respondent. With them on the brief were *Sheldon E. Bernstein* and *T. Bruce Fuller.*

MR. JUSTICE BURTON delivered the opinion of the Court.

This is an action which was brought in the Court of Claims by the respondent, Penn Foundry and Manufacturing Company, Inc., against the United States for loss of anticipated profits alleged to have been caused by the latter's cancellation of a contract for gun mounts for the Navy. The cancellation occurred a few days after the contract had been awarded by the United States to the respondent on February 23, 1942. The question presented is whether the findings of fact made by the Court of Claims are sufficient to sustain its judgment requiring the United States to pay for such loss. 110 Ct. Cl. 374, 75 F. Supp. 319. We hold that they are not. We so hold because of (1) the absence of any finding of the readiness and capacity of the respondent to perform certain of its contractual obligations upon which its profits were contingent and (2) the presence of certain affirmative findings which preclude the drawing of any sufficient inference of such readiness and capacity from the other findings.

The record includes only the pleadings and accompanying exhibits filed in the Court of Claims and that court's special findings of fact, conclusion of law, opinion, judgment and refusal to grant a new trial. We do not have before us the report which its Commissioner made to the

Court of Claims or the testimony upon which he or that court relied. While additional claims were made by the respondent, in its original petition to the Court of Claims and while the United States originally contested the binding force of the contract, the errors specified in the present proceeding question only the right of the respondent to recover $80,000 as damages for its alleged loss of anticipated profits. We granted certiorari because of the possible relation of the result in this case to claims under many war contracts cancelled by the United States. 335 U. S. 857.

The findings of fact show the following:

In 1911, the respondent bought a manufacturing plant consisting of six buildings in Waynesboro, Virginia. The main buildings, each 57 x 100 feet, had been built in 1890 and were referred to respectively as the machine shop, the foundry and the blacksmith shop. At one time the respondent manufactured circular saws and, at another, did work on brake shoes. Since 1931, the plant had been used only for minor engagements, requiring not more than four or five employees. It had been idle for some years when, late in 1940 or early in 1941, the respondent's officers became desirous of engaging in the National Defense Program. Most of those officers were then in other businesses at or near Pittsburgh, Pennsylvania. One stockholder and director was in the real estate business in Waynesboro. He had been the local manager of the plant when it was in operation and had continued thereafter as such and as the statutory agent of the company.

In January, 1941, the respondent engaged an additional man as assistant to the president and, on February 24, 1942, an engineer as general manager. In April, 1941, it submitted a proposal to the Navy for the manufacture of 500 3-inch 50-caliber gun mounts. In July, a representative of the Gun Mount Section of the Navy Department inspected the plant. Following a conference in

September, the respondent was asked by the Government to furnish information as to financial ability, commit-ments of subcontractors, and a detailed study of the machine tool operations, predicated upon a possible award of 150 3-inch 50-caliber mounts. In October and December, the respondent submitted additional information and slightly modified its proposals. December 22, the respondent's proposal as to prices, quantities, delivery schedule, payments and options for additional mounts was accepted as satisfactory and the respondent agreed to secure a letter from a surety company indicating that a bond of the nature required by the Navy's Bureau of Supplies and Accounts would be furnished.

The respondent received a "letter of intent," dated December 29, 1941, signed by the Paymaster General of the Navy as contracting officer and approved by the Under Secretary of the Navy. It stated that it was anticipated that the Navy Department would place an order with the respondent for the manufacture of 150 gun mounts. It specified the delivery of two complete mounts in May, 1942, three in June, five in July, and thereafter at a minimum rate of ten mounts per month. The letter also authorized the respondent to purchase materials and spare parts, subject to confirmation by the Government's purchasing officer, and to proceed with the production of the mounts in anticipation of the placing of the order for their production. However, under date of January 7, 1942, the Government held up this authorization of expenditures until such time as the respondent furnished the Government with the firm commitment of an approved surety company to act as surety on a performance bond. January 10, the respondent accepted the letter of intent. January 29, the Navy Department stated that the necessary letter from a surety company had not been received and that failure promptly to submit such a letter might result in the termination of the

letter of intent. February 3, the respondent's repre-
sentatives submitted a letter from a surety company
indicating that that company thought that a bond in
connection with a contract of this size would have to
be reinsured and that, unless some change were made
in the financial setup, reinsurance would be declined.
It added, however, that, if either of two suggested plans
relative to refinancing were accomplished and if the re-
spondent furnished certain information as to new key
personnel to be engaged by the respondent, then the
reinsurance could be obtained and the surety company
could execute a bond. The findings of fact disclose a
difference in the testimony as to the reaction of the
Government's representative to this letter. There is no
finding that the Government's requirement in this regard
ever was met.

Much in the following findings of fact Nos. 5–8 is vital
to the issue before us:

"5. On January 16 and 17, 1942, plaintiff's plant
was visited by inspectors of the Philadelphia Inspec-
tion District of the Navy Department to instruct
plaintiff's personnel as to the Navy inspection re-
quirements. *At the time there was no one at the
plant except the watchman and the local manager.
No work at all was being performed at the time.*
On February 19, 1942, a production specialist from
the War Production Board visited the plant. His
duties were to assist production in factories in the
production of naval ordnance. *At that time only
the watchman was at the plant.* The production
specialist inspected the plant with the local manager,
who was called from his real estate office, and also
talked with Mr. Johnson [the new assistant to the
president], who was called to Waynesboro for that
purpose. Reports of these visits were given to the
Navy Department. *At that time the company was*

*not prepared to undertake work of the character proposed by the contract, and would not for an indefinite time be prepared successfully to complete a contract for 150 gun mounts. Plaintiff's foundry was incapable of production of the cast steel forgings required for the gun mounts.* It was plaintiff's plan, as shown by its proposal to the Government, to subcontract for these castings, as well as for other parts of the work. Plaintiff had contacted certain producers, who were willing to furnish castings and other parts, but *no contracts for the castings or any other parts had been made by plaintiff. There was no reason to suppose that the plaintiff could not have obtained these parts from subcontractors.* Plaintiff planned to use around 150 mechanics, skilled, semi-skilled, and unskilled, in the machining and assembling of the gun mounts. Plaintiff had expected to secure former railroad shop mechanics residing near Waynesboro as the bulk of its employees. *The construction of gun mounts is difficult and exacting work. Manufacturers experienced in somewhat similar work with large organizations and trained mechanics required from seven months to one year from the time of receiving notice to proceed until the first gun mounts were produced. Plaintiff had no manufacturing organization and no force of trained personnel to train unskilled employees. Plaintiff's proposed general manager was at this time a regular employee of another company in Ohio.* He had been assisting plaintiff in its plans under the expectation that he would sever his connection with the other company and become plaintiff's general manager. A contract between plaintiff and the engineer under the terms of which the engineer was engaged as general manager was executed on February 24, 1942.

"6. Under date of February 23, 1942, the Navy Department mailed to plaintiff a notice of award of contract, No. LL96553, for gun mounts, in the amount of $2,087,555, which notice of award was received by the plaintiff on February 24, 1942. On February 24, 1942, after it had received the notice of award, plaintiff received a telegram as follows:

"NOTICE OF AWARD CONTRACT NOS 96553 FORWARDED IN ERROR RETURN FOR CANCELLATION NO AWARD TO YOU ACKNOWLEDGE REFERRING SYMBOL SPF—

"RAY SPEAR PAYMASTER GENERAL NAVY

"On March 5, 1942, the Navy Department prepared and mailed to plaintiff a letter as follows:

.  .        .        .        .

"*As it is apparent that you cannot secure a bond to insure faithful performance of the contract*, no contract will be issued to you, and the Letter of Intent LL–NOs–96553 (SPC), dated 29 December 1941, is hereby cancelled.

"Since no authority has been given you to incur any expenses under the Letter of Intent, there can be no liability on the Government by reason of the cancellation of the Letter of Intent.

"Please return the original and all copies of the Letter of Intent, unsigned, to the Bureau of Supplies and Accounts for cancellation.

"7. . . . . *The evidence does not disclose that any expenditures or expenses were incurred in reliance on the letter of intent or notice of award of contract.*

"8. *If the plaintiff had been permitted to perform its contract, it would have made a net profit of not less than $80,000.*" (Emphasis supplied.)   110 Ct. Cl. at pp. 378–381.

We are bound by the foregoing findings in testing the court's conclusion of law and judgment that the respondent is entitled to recover $80,000 for the loss of anticipated but unearned profits. *United States v. Causby*, 328 U. S. 256, 267; *United States v. Seminole Nation*, 299 U. S. 417, 422; *United States v. Esnault-Pelterie*, 299 U. S. 201, 205, 206; *Crocker v. United States*, 240 U. S. 74, 78; *Stone v. United States*, 164 U. S. 380, 382, 383.

The restricted scope of the errors sought to be reached by the petition for certiorari has eliminated all questions as to the binding force of the contract.[1] The Government, however, argues that, under the then existing statutes and regulations, it had a right to cancel the contract at its option without incurring liability for the respondent's alleged loss of anticipated profits caused by such cancellation.[2] It argues also that the practice of insert-

---

[1] The Government's brief says in a footnote that "The finding of the court below that a binding contract was consummated is, in our view, of doubtful soundness." However, in the same brief, the Government says that "The United States does not question in this Court the Court of Claims' holding that the notice of award sent by the Award Section of the Navy Department's Bureau of Supplies and Accounts created a binding contract between the United States and respondent on February 23, 1943 [1942]." The Court of Claims said in its opinion: "We think that the Government made a contract with the plaintiff, and that no mistake of the kind which would vitiate a contract occurred." 110 Ct. Cl. at p. 385. In its specification of errors to be urged, and in its statement of the questions presented by its petition for a writ of certiorari, the Government does not question the binding force of the contract. "Only the questions specifically brought forward by the petition for writ of certiorari will be considered." Rule 38, ¶ 2, of this Court.

[2] Title II, First War Powers Act of 1941, c. 593, 55 Stat. 839, § 201, 50 U. S. C. App. § 611; Executive Order No. 9001, 3 C. F. R. Cum. Supp. 1054–1056. See also, Contract Settlement Act of 1944, c. 358, 58 Stat. 649, 41 U. S. C. § 101, *et seq.*; Act of August 7, 1946, c. 864, 60 Stat. 902, 41 U. S. C. § 106 note; Regulation No. 7, Office of Contract Settlement, 32 C. F. R. 1944 Supp., § 8006.3 (c);

ing, in each contract for war supplies, an express provision permitting such a cancellation by the United States had developed to such an extent that we should recognize the provisions as constituting a part of the formal contract which the Government stated was to follow the award made to the respondent, February 23, 1942.[3]  It is

---

p. 3065; Office of Contract Settlement, A History of War Contract Terminations and Settlements, p. 27 (July, 1947).  As to comparable legislation affecting contracts for supplies in World War I, see Act of June 15, 1917, c. 29, 40 Stat. 182; Act of March 2, 1919, c. 94, 40 Stat. 1272; *De Laval Steam Turbine Co.* v. *United States,* 284 U. S. 61; *Barrett Co.* v. *United States,* 273 U. S. 227; *College Point Boat Corp.* v. *United States,* 267 U. S. 12; *Russell Co.* v. *United States,* 261 U. S. 514.

[3] See letter from James Forrestal, Acting Secretary of the Navy, October 10, 1943, Hearings before a Subcommittee on Contract Termination of the Senate Committee on Military Affairs on S. 1268, S. 1280 and S. J. Res. 80, 78th Cong., 1st Sess. 270–273 (1943), in which he said (p. 271):

"The Navy Department commenced in the summer of 1941 the consideration of contract termination as it might affect procurement. At that time there were few actual terminations in contemplation. Contractors were, nevertheless, questioning the Government's right to terminate contracts and fair provisions permitting such termination without cause and defining the rights of the parties in such event were deemed necessary to facilitate the urgently needed procurement and to minimize difficulties in the event of changing needs. A contract clause endeavoring to meet the procurement problem and safeguard the interests of both the Government and the contractors was then adopted and, except in respect of the ship construction contracts (a special problem), is in general form and substance in use in Navy contracts today."

See also, memorandum of the Industrial Readjustment Branch, submitted by James Forrestal, as Under Secretary of the Navy, January 11, 1944, in which it was stated that in the Navy—

"Standard termination clauses for fixed price contracts were developed late in 1941, and in general form and substance have been inserted in most contracts entered into since that time except for ship-construction contracts, which constitute a separate problem. The Department has not undertaken to modify outstanding contracts by the insertion of such clauses."  Appendix II, *id.* at p. 553 (1944).

not necessary, however, to sustain those claims in order to support the disposition which we are making of this case.

The Government argues further that the amount of the damages claimed by the respondent is not established with reasonable certainty by the findings of fact. The only finding as to the amount of such damages is the ultimate finding of fact No. 8, which says that "If the plaintiff had been permitted to perform its contract, it would have made a net profit of not less than $80,000." [4] There are no findings of evidentiary or primary facts on the subject of damages or the computation of anticipated net profits. The total payment to be made to the respondent for full performance of its part of the contract was fixed by the award at $2,087,555. Accordingly, the amount of the *gross* receipts anticipated by the respondent is not a remote or speculative estimate of the kind often encoun-

---

[4] The scope of our review of judgments of the Court of Claims is a limited one. The early practice and rules are discussed in *Luckenbach S. S. Co.* v. *United States*, 272 U. S. 533, 536–540. At the time of all the proceedings in the Court of Claims in the instant case, the authority of this Court to review causes upon petition for a writ of certiorari was set forth expressly in the Act of February 13, 1925, c. 229, 43 Stat. 939, § 3 (b), as amended by the Act of May 22, 1939, c. 140, 53 Stat. 752, which became 28 U. S. C. § 288 (b). It provided:

"(b) In any case in the Court of Claims, . . . it shall be competent for the Supreme Court, upon the petition of either party, whether Government or claimant, to require, by certiorari, that the cause be certified to it for review and determination of all errors assigned, with the same power and authority, and with like effect, as if the cause had been brought there by appeal. In such event, the Court of Claims shall include in the papers certified by it the findings of fact, the conclusions of law, and the judgment or decree, as well as such other parts of the record as are material to the errors assigned, to be settled by the Court.

"In such cases the Supreme Court shall have authority to review, in addition to other questions of law, errors assigned to the effect that there is a lack of substantial evidence to sustain a finding of fact; *that an ultimate finding or findings are not sustained by the*

tered in claims for anticipated profits. This Court long has recognized the right to recover damages for the loss of anticipated profits when they result from a breach of contract and when there is a sufficient basis for estimating them with reasonable certainty.[5] However, finding No. 8 as to the anticipated *net* profits in the instant case stands alone. Its sufficiency is open to argument in the absence of any findings as to the costs of production. The respondent seeks support for it in the indirect light

*findings of evidentiary or primary facts; or that there is a failure to make any finding of fact on a material issue."* (Emphasis supplied.)

The foregoing expressly controlled the practice until repealed by the new Judicial Code, effective September 1, 1948. The new Code, 28 U. S. C. § 1255, said merely:

"Cases in the Court of Claims may be reviewed by the Supreme Court by the following methods:

"(1) By writ of certiorari granted on petition of the United States or the claimant; . . . ."

The Reviser's Notes to that Section said:

"Provisions for authority to review, in addition to other questions of law, 'errors assigned to lack of evidence to sustain a finding of facts; that an ultimate finding or findings are not sustained by findings of evidentiary or primary facts; or that there is a failure to make a finding of fact on a material issue,' *were omitted as unnecessary."* (Emphasis supplied.) H. R. Rep. No. 308, 80th Cong., 1st Sess. A107 (1947).

[5] After discussing the general rule against the recovery of remote and speculative anticipated profits, this Court said in *Howard* v. *Stillwell & Bierce Mfg. Co.,* 139 U. S. 199, 206:

"But it is equally well settled that the profits which would have been realized had the contract been performed, and which have been prevented by its breach, are included in the damages to be recovered in every case where such profits are not open to the objection of uncertainty or of remoteness, or where from the express or implied terms of the contract itself, or the special circumstances under which it was made, it may be reasonably presumed that they were within the intent and mutual understanding of both parties at the time it was entered into. *United States* v. *Behan,* 110 U. S. 338, 345, 346, 347; *Western Union Tel. Co.* v. *Hall,* 124 U. S. 444, 454, 456;

thrown upon it by the opinion of the court below. However, even if that opinion may be resorted to to help interpret, although not to supplement, the court's findings of fact, it does not materially strengthen the respondent's position. For example, after reciting certain of the respondent's handicaps in supplying the gun mounts, to say nothing of supplying them at a net profit, the opinion says (p. 387):

> "We think that the consideration and tolerance with which the Government, during the time here in question, treated contractors actually engaged in producing defense material, if the contractor in good faith did his best to perform, is an indication that the plaintiff, if allowed to perform, would probably have succeeded in making a profit.
>
> "On the other hand, it must be said that the plaintiff would have had problems and difficulties that an active, going concern would not have had, and those difficulties would probably have adversely affected its profits. On the whole we can do only what a jury would do in a similar case. We conclude that the plaintiff would probably have made net profits of about 4% of the gross contract price, and we award it $80,000."

The opinion contributes nothing on the subject of costs except an emphasis upon the burden of them. The opinion points only to a suggested rule of thumb as a means of estimating the respondent's anticipated net profits.

*Philadelphia, Wilmington & Baltimore Railroad Co.* v. *Howard,* 13 How. 307."

See also, *Anvil Mining Co.* v. *Humble,* 153 U. S. 540, 550; *Cincinnati Gas Co.* v. *Western Siemens Co.,* 152 U. S. 200, 206; *United States* v. *Behan,* 110 U. S. 338, 344; *United States* v. *Speed,* 8 Wall. 77, 84; *Masterton* v. *The Mayor of Brooklyn,* 7 Hill (N. Y.) 61, 71; Restatement, Contracts § 331 (1932).

It suggests that the net profits, under the circumstances of this case, should be "about 4% of the gross contract price, . . . ."

Whether or not a reexamination of all the evidence that was before the court below might cure this uncertainty we cannot tell. We can conclude only that, on the limited findings before us, the amount, if any, of the respondent's anticipated *net* profit rests upon that court's rough estimate rather than upon its findings of evidentiary facts. We do not, however, decide the case on that issue. More fundamental to the respondent's case than the amount of its anticipated profits is the need for proof of the highly material facts of its willingness, readiness and capacity to manufacture and deliver the required gun mounts in the quantities and at the times specified.

1. *There is no finding of the readiness and capacity of the respondent to deliver the gun mounts in the quantities and at the times required by the contract.*—In the absence of actual tenders of the required gun mounts, such readiness and capacity are essential facts material to the respondent's right to receive payments under the contract. Without a right to such payments the respondent could realize no profits. See Restatement, Contracts §§ 284, 280 (1), 281, 318 (c), 395, 397 (1932). This issue goes deeper than that of the required reasonable certainty of the amount of the anticipated net profits claimed as damages. In a number of cases where this Court has allowed recovery for the loss of anticipated profits, it has emphasized its finding of a demonstrated willingness, readiness and capacity, on the part of the claimant, to perform the obligations which, if performed, would have entitled the claimant to payment under the contract. For example, in *United States* v. *Purcell Envelope Co.*, 249 U. S. 313, the United States, without adequate cause to do so, cancelled a recently made contract to purchase, from the

Purcell Envelope Company, a four-years' supply of en-
velopes and wrappers for the Post Office Department for
$2,460,556.22. This Court affirmed a judgment of the
Court of Claims awarding the company $185,331.76 for
its loss of anticipated net profits which it would have re-
ceived if it had been allowed to perform the contract.
In that case this Court said (p. 316): "The Envelope
Company had, however, already made arrangements and
contracts for the supplying to it of the necessary materials
to fulfill the terms of the contract and was ready and
willing at all times to fully perform it according to its
terms." Again (p. 319): "There is no charge of default
against the Envelope Company, no charge of inability to
perform its contract, . . . ." And finally (p. 321): "The
court [of Claims] in its opinion expressly declares that the
findings showed that the Envelope Company had fulfilled
all the requirements of the Postmaster General and was
ready and willing to furnish the envelopes and wrap-
pers . . . ." See also, *Hinckley* v. *Pittsburgh Steel Co.*,
121 U. S. 264, 276; *Smoot's Case*, 15 Wall. 36, 44; *United
States* v. *Speed*, 8 Wall. 77, 84.

In its petition for a writ of certiorari in the instant case,
the United States specified that the Court of Claims
erred in failing to make the finding that the respondent
had not proved that it could have successfully performed
the contract and made a profit thereon. Whether or not
it was error to fail to make such an express finding of the
respondent's failure of proof, it is clear that there was
wholly absent from the court's findings any express state-
ment that the respondent was ready and capable of per-
forming its obligations under the contract. It did con-
stitute error to render judgment for recovery of damages
by the respondent in the absence of that material fact.
There remains only the question whether an inference
of the required readiness and capacity of the respondent

to perform its obligations under the contract can be inferred from the other findings.

2. *The presence of certain affirmative findings precludes the drawing of any sufficient inference of the respondent's readiness and capacity to deliver the gun mounts in the quantities and at the times required.*— The respondent has the burden of proof. Finding of fact No. 5, quoted in full, *supra*, at pp. 202–203, tells the story. The affirmative evidentiary findings there made add up to an inescapable ultimate finding that the respondent was *not either ready or capable* of making the required deliveries of two complete gun mounts in May, 1942, three in June, five in July and thereafter at a minimum rate of ten gun mounts a month. February 19, about three and one-third months before the first delivery was due, production was not under way, even in a preliminary stage.

> "At that time the company was not prepared to undertake work of the character proposed by the contract, and would not for an indefinite time be prepared successfully to complete a contract for 150 gun mounts. . . . Manufacturers experienced in somewhat similar work with large organizations and trained mechanics required from seven months to one year from the time of receiving notice to proceed until the first gun mounts were produced. Plaintiff had no manufacturing organization and no force of trained personnel to train unskilled employees." Finding No. 5, 110 Ct. Cl. at p. 379.

The findings of fact show also that the following statement was made to the respondent in the Government's letter of March 5, 1942, after the Government's insistence upon a performance bond: "As it is apparent that you cannot secure a bond to insure faithful performance of the contract, no contract will be issued to you, . . . ." Finding No. 6, *id.* at p. 380. There is no

finding that the respondent ever met or was capable of meeting this requirement.

As against these devastating findings, only finding of fact No. 8 even suggests the respondent's readiness and capacity to perform the obligations necessary to entitle it to compensation under the contract. It says: "If the plaintiff had been permitted to perform its contract, it would have made a net profit of not less than $80,000." *Id.* at p. 381.

This is no more than a rough estimate by the Court of Claims of what would be the amount of the respondent's reasonably anticipated profits if the contract were completed. It is not a finding that the respondent was ready and capable of making the deliveries upon which such profits must depend. The striking fact is that the other findings of the Court of Claims show that the respondent was *not* prepared to make those deliveries and that this was due to the respondent's own lack of capacity to perform its obligations. To support the judgment of the court below, this ultimate finding of fact No. 8 would have to be read as itself supplying the missing finding of the respondent's readiness and capacity to perform its full obligations. In that role it fails utterly. It not only contains no evidentiary findings on the subject but if it is regarded as implying them they come into direct conflict with the evidentiary findings of fact, Nos. 5 and 6, to the contrary.

The possibility, suggested in the opinion, of securing from the Government gratuitous extensions of time or concessions in the numbers of gun mounts to be delivered may have justified the respondent's hope that it might ultimately produce, with inexperienced labor in its rehabilitated plant, the new products called for by the contract. Such a possibility, however, cannot justify the award of money damages by the Court of Claims to equal a loss of unearned anticipated profits dependent

upon such possible gratuitous extensions or concessions. Even assuming the willingness of the respondent to perform its obligations, proof of its essential readiness and capacity to do so is missing.

The judgment of the Court of Claims accordingly is reversed and the cause is remanded with direction to enter judgment in favor of the United States.

*Reversed.*

MR. JUSTICE REED and MR. JUSTICE JACKSON concur in the reversal and dissent from the order to enter judgment in favor of the United States. In their opinion, respondent should have an opportunity to meet the stated requirements of proof.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BLACK, MR. JUSTICE MURPHY, and MR. JUSTICE RUTLEDGE agree, concurring.

It is clear and undisputed that the contract which the parties made was to be reduced to formal terms. Both the "letter of intent"[1] and the "official award"[2] by their express terms state that a "formal contract" was contemplated. That circumstance raises difficulties for respondent which neither it nor the Court of Claims nor this Court has surmounted.

During the period of time relevant here, the Navy (apart from exceptions inapplicable to the type of contract involved in this case) had "standard termination clauses for fixed price contracts" which "in general form

---

[1] The "letter of intent" indicated the manner in which respondent could approve the proposal, "thereby constituting this letter a contract until the execution of a formal contract . . . ."

[2] The "official award" stated that the Navy's acceptance of respondent's proposal was authority to commence performance "without waiting for the formal contract."

and substance" were inserted "in most contracts." [3]   They provided that in the event of cancellation "for the .convenience of the Government" the contractor would-be paid "for all costs, including a proper allocation of overhead expenses to the contract, incurred up to the time of termination, plus an allowance of 6% or 7% profit on all such costs except purchases of materials and unfinished goods, for which the contractor was reimbursed at cost." [4]

---

[3] Memorandum from James Forrestal, Under Secretary of the Navy, Jan. 11, 1944, Senate Hearings on S. 1268, S. 1280, and S. J. Res. 80, 78th Cong., 1st Sess., 551, 553, where it is said:

"Standard termination clauses for fixed price contracts were developed late in 1941, and in general form and substance have been inserted in most contracts entered into since that time except for ship-construction contracts, which constitute a separate problem.   The Department has not undertaken to modify outstanding contracts by the insertion of such clauses.   It is difficult to estimate the time which would be required to incorporate such a clause by amendment in all contracts.   However, it is doubted that such action would be administratively feasible except upon the initiative of the contractor."

And see letter of the Acting Secretary, Oct. 10, 1943, id., 270–271.

[4] See record p. 177 in *Pownall* v. *United States*, 334 U. S. 742, and record p. 227 in *Alexander Wool Combing Co.* v. *United States*, 334 U. S. 742.   And see H. R. Hearings on H. R. 3022, 78th Cong., 1st Sess. 27.   At the time, Title II of the First War Powers Act, § 201, 55 Stat. 839, 50 U. S. C. App. § 611, was in effect empowering the President to authorize any department or agency exercising functions in connection with the prosecution of the war effort under regulations prescribed by him "to enter into contracts and into amendments or modifications of contracts heretofore or .hereafter made . . . without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war . . . ."   By Executive Order 9001, dated Dec. 27, 1941, 6 Fed. Reg. 6787, 3 C. F. R. Cum. Supp. 1054, the President delegated this authority to various agencies, including the Navy Department.   He also authorized the Navy "by agreement" to modify or amend or settle "claims" under contracts and provided that the amendments and modifications "may be with or without consideration and may be utilized to accomplish the same things as any original contract could have accomplished hereunder,

That policy of the Navy, revealed as it was in official communications to Congress, is a matter of which we can take judicial notice. We have heretofore amplified findings of facts by reports of the Secretary of War. *Tempel* v. *United States,* 248 U. S. 121, 130. The official communications which disclose the policy of the Navy in this case, like reports, rules and regulations of agencies [5] or other communications to Congress,[6] are equally reliable and authoritative and need no further proof.

Respondent, however, has not carried the burden of showing that it would have been saved from the application of that policy. It has not shown that its contract falls in an exempt class. It has not shown that what was usual or customary for other contracts of this type would not be written into the formalized agreement to which its contract with the Government was to be reduced. It has not shown how it could escape application of the Navy's general policy and be granted the favor of a contract without a termination clause.

Yet unless it can make that showing, it has not established by "clear and direct proof," as *United States* v. *Behan,* 110 U. S. 338, 344, requires, that it would have been free to make the profits which it claims as damages for breach of the contract. For the customary termination clause relieved the promisor of any liability for unearned profits of the character claimed here. Since respondent did not show that at least in all probability its contract would have been free of that provision, it failed at the threshold of the case to carry the burden which rested on it.

---

irrespective of the time or circumstances of the making of or the form of the contract amended or modified, or of the amending or modifying contract, and irrespective of rights which may have accrued under the contract, or the amendments or modifications thereof."

[5] See *Lilly* v. *Grand Trunk R. Co.,* 317 U. S. 481, 488; *Labor Board* v. *Atkins & Co.,* 331 U. S. 398, 406–407.

[6] See *Ludecke* v. *Watkins,* 335 U. S. 160, 166–170.