Per Curiam:
Following our disposition of the issue of liability in this case in plaintiff’s favor (152 Ct. Cl. 137, 285 F. 2d 438 (1961)), the case was referred pursuant to Pule 38 (c) (now Pule 47(c)) to Mastín G. White, a trial commissioner of this court, with directions to make findings of fact and conclusions of law respecting the amount of recovery. The commissioner has done so in a report filed February 20, 1963. Briefs were filed by the parties, exceptions to the commissioner’s findings of fact and recommended conclusion of law were filed by both parties, and the case was submitted to the court on oral argument of counsel. Since the court is in agreement with the additional findings of fact, supplemental opinion and recommendation of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.
Plaintiff is entitled to recover, and judgment is entered for bim in the sum of $176,800.
SUPPLEMENTAL OPINION OE COMMISSIONER
The court disposed of the issue of liability in this case by rendering on January 18,1961, a decision (152 Ct. Cl. 137,285 F. 2d 438) which held that the Government, during the period 1950-1951, had breached a contract then in existence *409 between the plaintiff and the Government, and that the plaintiff was entitled to a judgment against the Government.
During the 1950-1951 period mentioned in the preceding paragraph, the plaintiff held a lease, numbered BLM-C-018126 (Oklahoma), which had been issued to the plaintiff by the Government (acting through the Department of the Interior) and which authorized the mining of the coal deposits in 2,162.71 acres of public land situated near Bokoshe, Oklahoma. The plaintiff desired to strip-mine the land in question, but he was prohibited from doing so by the Geological Survey of the Department of the Interior. The court, in its opinion of January 18, 1961, said that the prohibition against strip-mining “was unjustified and constituted a breach of the contract of lease” (285 F. 2d at p. 442). The court entered a judgment to the effect that the plaintiff was entitled to recover, and remanded the case to the commissioner for further proceedings under Buie 88(c) to determine the amount of recovery.
The problem of attempting to determine what would have happened if the plaintiff had been permitted to strip-mine the public land covered by lease BLM-C-018126 (Oklahoma) in accordance with his desire was a difficult one. Further trial sessions were held over a 5-day period for the reception of evidence bearing on this problem. The transcript of the additional testimony covered 952 pages, and numerous additional exhibits were received in evidence. Most of the testimony was given by expert witnesses whose qualifications were quite impressive and who had obviously devoted a great deal of time and effort to the task of preparing for their appearances. As frequently happens in such situations, however, the opinions of the experts varied widely with respect to some of the important matters that had to be resolved in reaching a conclusion regarding the amount of the damages sustained by the plaintiff because of the refusal of the Geological Survey to permit him to strip-mine the public land covered by lease BLM-C-018126 (Oklahoma).
On the basis of the whole record, the defendant concedes that the plaintiff, if he had been permitted to strip-mine the 2,162.71 acres of public land under lease BLM-C-018126 *410 (Oklahoma), could reasonably have made profits totaling $154,446.97. The plaintiff, on the other hand, contends that his profits from such strip-mining operations would have totaled $1,901,769.56.
The additional findings of fact that are included in this supplemental report represent the results of a careful attempt to evaluate the often conflicting opinions of the expert witnesses. The material in the additional findings will be summarized in the succeeding paragraphs of this opinion.
In the expectation of being permitted to strip-mine the land covered by lease BLM-C-018126 (Oklahoma), the plaintiff arranged in 1950 with Hanford Farrell for the use of some good equipment which was then located about 10 miles from the land involved in this action and could have been transferred to this land without any great difficulty. Included among this equipment were a large Monighan 9-W Special dragline, a D-8 bulldozer, a No. 12 motor patrol, a truck-mounted Hardscog horizontal drill, a truck-mounted McCarthy vertical drill, two 6-inch centrifugal pumps, one 3-inch centrifugal pump, a Linkbelt combination dragline and shovel, a 105-cubic-foot air compressor, two jackhammers, a pickup truck, and a 4-track coal tipple. For furnishing this equipment, Mr. Farrell was to receive 50 percent of the profits (if any) derived from the contemplated strip-mining operations. Under the agreement between the plaintiff and Mr. Farrell, the latter has a 50 percent interest in any amount that may be recovered by the plaintiff in the present action.
With the equipment mentioned in the preceding paragraph, it would have been physically and economically feasible for the plaintiff, if he had been permitted to strip-mine the 2,162.71 acres of public land under lease BLM-C-018126 (Oklahoma), to produce coal beginning at a depth of about 10 feet below the surface of the ground and continuing to a depth of about 65 feet below the surface of the ground. The quality of any coal lying closer than 10 feet to the surface of the ground would not have been sufficiently good to justify its recovery and marketing. The recoveiy of coal lying more than 65 feet below the surface of the ground *411 would not have been physically and economically feasible with the available equipment. The evidence in the record indicates that, between the 10-foot and the 65-foot depths previously mentioned, the public land in question contained approximately 555,000 tons of coal.
One of the questions involved in the supplemental proceedings under Rule 38 (c) is whether the plaintiff, if he had been permitted to conduct strip-mining operations under lease BLM-C-018126 (Oklahoma), would have been required to leave a plug in order to make provision for the subsequent establishment of an underground mine to recover the deeper coal deposits in the 2,162.71 acres of public land.
At all times pertinent to this litigation, there was a recognized and accepted mining procedure in the operation of a strip mine for coal whereby a plug or barrier pillar was left unstripped along the outcrop line for the purpose of preserving an entry for subsequent slope mining to reach the deeper coal deposits after the completion of strip-mining operations. The leaving of such plugs was common in the eastern Oklahoma coal areas, up to and including the 1950-1951 period when the plaintiff was endeavoring to obtain permission for the conduct of strip-mining operations under lease BLM-C-018126 (Oklahoma).
During the 1950-1951 period, the Geological Survey was of the opinion that the proper and maximum development of the coal resources in the public land covered by lease BLM-C-018126 (Oklahoma) required the ultimate establishment on such land of an underground mine for the recovery of the deeper coal deposits. In this connection, it should be noted that the extensive exploratory work which was subsequently performed during 1953 by the Core Mining Company in anticipation of the establishment of an underground mine on this land, and which showed the infeasibility of establishing an underground mine here, would not have been performed if the plaintiff had been given permission to strip-mine this land. Hence, the Geological Survey would still have retained the opinion that it was advisable to make provision for the subsequent establishment of an underground mine to recover the deeper coal deposits; and it *412 is reasonable to infer that the Geological Survey would have required the plaintiff, in connection with his stripping operations, to leave unstripped a plug for the purpose of preserving a means of access to the deeper coal deposits. The leaving of a plug would have made unavailable for strip mining approximately 30,000 tons of the 555,000 tons of coal previously mentioned.
Another controversial question is whether the coal beneath two roadways that traversed this land should be regarded as minable by the plaintiff, if permission had been given him for the conduct of strip-mining operations under lease BLM-C-018126 (Oklahoma). Since the evidence does not show that the plaintiff could have obtained permission from the appropriate authorities for the relocation of the roads, and in view of the cost that would have been involved in such relocation, it seems to be a justifiable inference that the plaintiff would not have recovered and marketed the coal beneath the roadways. Hence, I believe that this coal, totaling about 28,000 tons, should also be subtracted from the 555,000 tons of coal previously mentioned.
When the 58,000 tons of coal mentioned in the two immediately preceding paragraphs are deducted from the 555,000 tons of coal mentioned earlier as lying between the 10-foot and the 65-foot depths within the public land involved in this action, it appears that a total of approximately 497,000 tons of coal in place would have been available for the plaintiff’s strip-mining operations in the public land, if such operations had been permitted under lease BLM-C-018126 (Oklahoma).
However, because of the faulting in such land and other factors that would have interfered with the recovery of the coal in place, it would not have been possible for the plaintiff to effect a 100-percent recovery of all the available coal. It is my view, on the basis of the evidence in the record, that the faulting, etc., would have prevented the plaintiff from recovering about 20 percent of the coal in place. Conversely, I believe that the plaintiff would have been able to recover and market, over a period of 4 or 5 years, approximately 80 percent of the coal in place, or a total of approximately 397,600 tons of coal.
*413 It is my best estimate from tbe evidence in tbe record that not more tban 50 percent of tbe 397,600 tons of recoverable coal mentioned in the preceding paragraph could have been marketed for domestic use, that it would have been necessary for the remainder of the coal to be marketed as slack coal for industrial use or for the manufacture of briquettes, and that the plaintiff would have received an average price of about $5.50 per ton (after the deduction of commissions and other sales expenses) for all the coal produced and marketed. Therefore, the total proceeds from the 397,600 tons of coal would have amounted to approximately $2,186,800.
It is also my best estimate, on the basis of the more persuasive evidence in the record, that if the plaintiff had been permitted to strip-mine the public land under lease BLM-C-018126 (Oklahoma), the average cost per ton of producing the coal would have been about $5. On that basis, the total cost of producing the 397,600 tons of coal previously mentioned would have amounted to approximately $1,988,000.
For the reasons indicated heretofore in this supplemental opinion, it is my estimate that the plaintiff, if he had been permitted to strip-mine the 2,162.71 acres of public land under lease BLM-C-018126 (Oklahoma), would have made a profit of approximately $198,800 ($2,186,800 minus $1,988,000) from such strip-mining operations.
In determining the amount of the plaintiff’s damages, however, it should be borne in mind that the plaintiff actually received $22,000 when he disposed of lease BLM-C-018126 (Oklahoma) to the Core Mining Company in 1951. When this $22,000 is deducted from the $198,800 representing the loss of anticipated profits, it appears that the plaintiff sustained damages amounting to $176,800 from the breach of contract that is involved in the present case.
Accordingly, I recommend that, under the court’s decision of January 18, 1961, a judgment be entered for the plaintiff in the amount of $176,800.
ADDITIONAL FINDINGS OF FACT
42. The equipment referred to in findings 11 and 17 included : a large Monighan 9-W Special dragline; a D-8 bull *414 dozer; a No. 12 motor patrol; a truck-mounted Hardscog horizontal drill; a truck-mounted McCarthy vertical drill; two 6-inch centrifugal pumps; one 3-inch centrifugal pump; a Linkbelt combination dragline and shovel; a 105-cubic-foot air compressor; two jackhammers; a pickup truck; and a 4-track coal tipple. For furnishing this equipment under the agreement mentioned in finding 17, Hanford Farrell was to receive 50 percent of the profits (if any) derived from the contemplated strip-mining operations. Mr. Farrell has a 50-percent interest in any amount that may be recovered by the plaintiff in the present action.
43. With the equipment referred to in findings 11,17, and 42, it would have been physically and economically feasible for the plaintiff, if he had been permitted to strip-mine the public land referred to in finding 1 under lease BLM-C-018126 (Oklahoma), to produce coal beginning at a depth of about 10 feet below the surface of the ground and continuing to a depth of about 65 feet below the surface of the ground. The quality of any coal lying closer than 10 feet to the surface of the ground would not have been sufficiently good to justify its recovery and marketing; and the recovery of coal lying more than 65 feet below the surface of the ground would not have been physically and economically feasible with the available equipment.
44. Between the 10-foot and 65-foot depths referred to in finding 43, the public land mentioned in finding 1 contained approximately 555,000 tons of coal.
45. The 555,000 tons of coal referred to in finding 44 included approximately 28,000 tons of coal lying beneath two roadways that traversed the public land mentioned in finding 1. Since the evidence does not show that the plaintiff could have obtained permission from the appropriate authorities for the relocation of the roads, and in view of the cost that would have been involved in such relocation, the inference is warranted that the plaintiff would not have recovered and marketed the coal beneath the roadways if he had been given permission to conduct strip-mining operations under lease BLM-C-018126 (Oklahoma).
46. If the plaintiff had been permitted under lease BLM-C-018126 (Oklahoma) to strip-mine the public land referred *415 to in finding 1, such operations would have commenced in the fall of 1950 or in 1951 and would have continued for the next few years. In view of the opinion of the Geological Survey at the time that the proper development of the coal resources in the leased land required the ultimate establishment of an underground mine for the recovery of the deeper coal deposits, it is reasonable to infer that the Geological Survey would have required the plaintiff, in connection with his stripping operations, to leave unstripped a plug (see findings 9-11) for the purpose of preserving a means of access to the deeper coal deposits. The leaving of a plug would have made unavailable for strip-mining approximately 30,000 tons of the coal referred to in finding 44. (The extensive exploratory work which was performed during 1953 in anticipation of the establishment of an underground mine, and which showed the infeasibility of establishing an underground mine on the land in question (see finding 36), would not have been performed if the plaintiff has been given permission to strip-mine this land; and the Geological Survey would still have retained the opinion that it was advisable to make provision for the subsequent establishment of an underground mine to recover the deeper coal deposits.)
47. Of the total of approximately 497,000 tons of coal in place (555,000 tons as indicated in finding 44, minus 28,000 tons as indicated in finding 45, minus 30,000 tons as indicated in finding 46) that would have been available in the public land mentioned in finding 1 for the plaintiff’s strip-mining operations, if such operations had been permitted under lease BLM-C-018126 (Oklahoma), the plaintiff would have been able to recover and market, over a period of 4 or 5 years, about 80 percent of such coal in place, or approximately 397,600 tons of coal. The plaintiff would have been prevented from producing the other 20 percent of the coal in place by the faulting in the coal seams and other contingencies inimical to a 100-percent recovery of the coal in place.
48. Not more than 50 percent of the 397,600 tons of recoverable coal mentioned in finding 47 could have been marketed for domestic use. It would have been necessary to *416 market the remainder of the coal as slack coal for industrial use or for the manufacture of briquettes.
49. The plaintiff would have received an average price of about $5.50 per ton (after the deduction of commissions and other sales expenses) for the 397,600 tons of coal produced and marketed from the public land involved in this action, as indicated in findings 47 and 48. Therefore, the total proceeds derived from the marketing of the 397,600 tons of coal would have amounted to approximately $2,186,800.
50. It would have cost the plaintiff an average of about $5 per ton to produce the 397,600 tons of coal referred to in findings 47-49. Hence, the total cost of producing such coal would have amounted to approximately $1,988,000.
51. If the plaintiff had been permitted to strip-mine the public land referred to in finding 1 under the lease BLM-C-018126 (Oklahoma), the plaintiff would have derived a profit of approximately $198,800 ($2,186,800 minus $1,988,000) from such operations.
52. As the plaintiff received $22,000 in disposing of lease BLM-C-018126 (Oklahoma) to the Core Mining Company (see findings 32 and 35), the plaintiff’s damages in the present case amounted to $176,800 ($198,800 minus $22,000).
CONCLUSION OE LAW
Upon the foregoingfindings of fact and those incorporated in the court’s decision of January 18, 1961, all of which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that the plaintiff recover of and from the United States the sum of one hundred seventy-six thousand eight hundred dollars ($176,800).