CALIFORNIA FEDERAL BANK,
A Federal Savings Bank,
Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 92–138 C.

United States Court of Federal Claims.

April 16, 1999.

**447**

Steven S. Rosenthal & Vince Colitriano, Cooper, Carvin & Rosenthal, PLLC, Ronald W. Stevens & Joseph J. Brigati, Kirkpatrick & Lockhart, LLP, Richard D. Bernstein, Sidley & Austin, Washington, D.C., and Kenneth R. Heitz, Irell & Manella, LLP, Los Angeles, CA, for plaintiff.

Lee M. Straus, Elizabeth W. Newsom, Reneé Brooker, Delfa Castillo, Teresa A. Kolb, Kenneth M. Kulak, and Tarek Sawi, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HODGES, Judge.

The Supreme Court has ruled that the United States breached its contracts with certain financial institutions when it enacted the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), *United States v. Winstar Corporation,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). FIRREA eliminated the use of a special accounting treatment for banks' acquisitions of failing thrifts. Therefore, the law of this case is that the Government broke its promise to California Federal Bank (Cal Fed) that it could count "supervisory goodwill" as capital and amortize it over a period of 40 years. We are directed to determine the damages flowing from that breach of contract. *See California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997).

Plaintiff argued that damages flowing from defendant's breach of contract totaled more than $1 billion. Cal Fed did not prove such damages at trial, however. It did not establish substantial losses that we could translate into damages properly awarded against the United States in this court. Cal Fed was a relatively healthy thrift before it entered into this contract, and it is healthy today.

Well-qualified experts for both sides testified during six weeks of trial. We questioned them closely concerning the nature and value of goodwill, which is the subject matter of this contract. We have considered all of that testimony and other evidence carefully. Plaintiff did not prove that it was damaged beyond the costs of raising capital to replace its goodwill.

## BACKGROUND

The Federal Savings and Loan Insurance Corporation (FSLIC) lacked resources to rescue all of the failing thrifts during the savings and loan crisis of the 1980's. Therefore, the Federal Home Loan Bank Board encouraged healthier thrifts to take over failing thrifts through supervisory mergers. As an incentive, acquiring entities were allowed to use "supervisory goodwill" toward their capital reserve requirements. Goodwill was

the amount by which liabilities of the acquired failing thrifts exceeded their assets.

Cal Fed acquired four failing thrifts in Georgia and Florida through supervisory mergers in February 1982. Through a series of documents, a contract was created which authorized the merger of thrifts known as "Southeast" with Cal Fed.[1]

Cal Fed assumed approximately $305 million in net liabilities from the Southeast merger that was recorded on its books at goodwill. FSLIC gave Cal Fed $9 million for the transaction because the four Southeast thrifts were in danger of default. The goodwill was to be amortized over 35 to 40 years. Cal Fed sold most of the Southeast thrifts in Georgia in 1986, and sold the remainder of the Southeast division in 1994.

Cal Fed acquired Brentwood Savings and Loan through a supervisory merger in October 1982.[2] It assumed $315 million in net liabilities (goodwill) as a result of the transaction. The goodwill was to be amortized over 35 to 40 years.

Congress passed the Financial Institutions Reform, Recovery and Enforcement Act in 1989.[3] That law prohibited thrifts from continuing to count supervisory goodwill as part of their capital reserve. At the time of FIRREA, $390 million in goodwill remained on Cal Fed's books. After FIRREA, Cal Fed was forced to phase out its remaining goodwill in five steps between December 1989 and January 1995. Thus, all supervisory goodwill resulting from the Southeast and Brentwood transactions was removed from Cal Fed's books by 1995. The contractual schedule would have completed the phase-out of goodwill between 2017 and 2022.

## SUMMARY OF OPINION

### I. Assumption of Liabilities

Plaintiff was not harmed by its assumption of the assets and liabilities of the failing institutions that it acquired. The net liabilities assumed by plaintiff exceeded assets because of high mortgage interest rates and purchase accounting principles.[4] When interest rates fell, plaintiff no longer held liabilities that exceeded assets. Of the loans that Cal Fed sold prior to the interest rate decline, the proceeds were reinvested in fixed rate loans. This benefitted Cal Fed.

Plaintiff is not entitled to credit for the money that FSLIC might have saved from not having to liquidate the failing thrifts. It is not entitled to recover investment income that the Government may have earned on the funds FSLIC retained as a result of not having to liquidate the thrifts that Cal Fed took over. Cal Fed's acquisition of the failing thrifts was successful; they resulted in a going concern. Plaintiff turned the failing thrifts around and made money from them, but no one knew at the time of contracting whether this would occur.

### II. Wounded Bank Damages

Plaintiff's argument essentially is that defendant's withdrawal of Cal Fed's right to use goodwill as capital put the bank in a perilous financial condition that resulted in certain costs that plaintiff otherwise would not have incurred. These included higher costs of deposits because of customer concern, higher assessment fees charged by the regulators, and higher borrowing costs. Plaintiff did not establish a relationship between these costs and any actions by the federal government, however. If it had, plaintiff did not establish that defendant's breach caused those problems. If plaintiff was damaged at all from its contract with defendant, it has not made the showing necessary to support a substantial judgment against the United States. Evidence of $285 million in wounded bank costs was "too uncertain and remote to be taken into consider-

---

1. The Southeast transaction consisted of four institutions: Peach State, United, Guaranty, and First Sylvania.

2. Brentwood Savings and Loan was a single institution, located in California.

3. *See Winstar*, 518 U.S. at 839, 116 S.Ct. 2432, for a full discussion of FIRREA.

4. Purchase accounting permits "the acquiring entity to designate the excess of the purchase price over the fair value of all identifiable assets acquired as an intangible asset called 'goodwill.'" *Winstar*, 518 U.S. at 848, 849, 116 S.Ct. 2432. For a more detailed discussion of purchase accounting, see *Winstar*.

ation as part of the damages occasioned by the breach of the contract in suit." *Myerle v. United States,* 33 Ct.Cl. 1, 26, 1800 WL 2024 (1897).

### III. Lost Profits

We directed the parties not to argue lost profits at trial because it became clear that such damages would have been impermissibly vague and speculative. "The general rule in common law breach of contract cases is to award damages that will place the injured party in as good a position as he or she would have been in had the breaching party fully performed." *Estate of Berg v. United States,* 231 Ct.Cl. 466, 687 F.2d 377, 379 (1982) (citing *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875, 524 F.2d 707, 713 (1975)). But what does "fully performed" mean in this case. Plaintiff performed its part—taking over the failing Southeast and Brentwood banks. Defendant's performance would have been allowing supervisory goodwill to count as capital for 33 more years. What consequences would such an allowance have had? How would plaintiff's fortunes have changed? Too many variables and unknowns prevent us from making a reasonable guess. "Remote and consequential damages are not recoverable in a common law breach of contract ... especially ... in suits against the United States for the recovery of common law damages ...." *Northern Helex,* 207 Ct.Cl. at 886, 524 F.2d 707.

### IV. Replacement Costs

The subject matter of this contract is goodwill. The promise that defendant made to Cal Fed and others was that they could use goodwill as capital for a period of 35 to 40 years. The difficulty is that the goodwill has no value in this context. It is not as though the Government promised to buy 100 widgets then changed its mind. The Government in its regulatory mode told Cal Fed that it could take the amount by which the failing thrifts' liabilities exceeded their assets and call it "capital." Because goodwill has no monetary value, as 100 widgets might, the only importance that promise held for Cal Fed was that the goodwill made its capital ratios look better. Defendant did not guarantee that regu-

lators would not close the bank anyway, because they take other indications of a bank's health into consideration. These include management, liquidity, loan appraisals, and underwriting procedures for example.

When Cal Fed no longer could use goodwill as capital, it replaced a useless accounting entry with real money. It was successful in replacing its goodwill and never was out of capital compliance. We cannot see how Cal Fed was damaged by replacing imaginary capital with real capital, other than having to pay certain operational costs that perhaps it would not have incurred otherwise. These are the costs that meet the tests of *Myerle* and other cases that are binding on this court.

### DAMAGE REMEDIES

An early Supreme Court decision articulated various remedies available for breach of contract:

> When a party injured by the stoppage of a contract elects to rescind it, then, it is true, he cannot recover any damages for a breach of the contract, either for outlay or for loss of profits; he recovers the value of his services actually performed as upon a *quantum meruit* [restitution]. There is then no question of losses or profits. But when he elects to go for damages for the breach of the contract, the first and most obvious damage to be shown is, the amount which he has been induced to expend on the faith of the contract, including a fair allowance for his own time and services [reliance]. If he chooses to go further, and claims for the loss of anticipated profits [expectancy], he may do so, subject to the rules of law as to the character of the profits which may be thus claimed. *United ed States v. Behan,* 110 U.S. 338, 345, 4 S.Ct. 81, 28 L.Ed. 168 (1884).

### I. Restitution

Restitution as a remedy has a flexible meaning and it may apply to a wide variety of fact situations. John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 15–2, at 648 (3d ed.1987). The core principle of this remedy is that a person who has been unjustly enriched at the expense of another

must make restitution to the injured party. Restatement of Restitution 1 (1937). This is not an operative rule, however, but a general principle. Calamari & Perillo, *supra*, § 15–2, at 648. Often restitution remains available where the defendant has not been enriched, but the plaintiff has suffered losses. *Id.*

■ Restitution is available whether the defendant breaches by nonperformance or by repudiation. Restatement (Second) of Contracts § 373 cmt. a (1981). Only cases of total breach, however, entitle plaintiff to restitution. *Id.* Traditionally, a suit for damages was deemed to be an attempt to enforce the contract while restitution could be obtained only after recission of the contract. This traditional view has left its imprint on the rules governing the availability of restitution and the measure of recovery. Calamari & Perillo, *supra*, § 15–3, at 649. However, it is now generally recognized that the right to damages or to restitution is the same because "both [are] remedial rights based on the contract." *Id.*

■ The aim of restitution is to place the plaintiff in the same economic position as it occupied before entering into the contract. Calamari & Perillo, *supra*, § 15–4, at 651. Plaintiff's recovery will amount to the reasonable value of "services rendered, goods delivered, or property conveyed less the reasonable value of any counter-performance received by him." *Id.*

The Court of Claims applied flexible principles of restitution in *Acme Process Equip., Co. v. United States*, 171 Ct.Cl. 324, 347 F.2d 509, 530 (1965). The court noted that when the defendant defaults, "restitution is permitted as an alternative remedy ... in an effort to restore the innocent party to its pre-contract *status quo*, and not to prevent the unjust enrichment of the breaching party." *Id.* at 530.

## II. Reliance

Reliance damages seek to place the plaintiff "in as good a position as he would have been in had the contract not been made." Restatement (Second) of Contracts § 344(b) (1981). Reliance damages include expenditures made "in preparing to perform, in performing, or in foregoing opportunities to make other contracts." Restatement (Second) of Contracts § 344 cmt. a (1981). This relief is awarded on "the assumption that the value of the contract would at least have covered the outlay." Charles T. McCormick, Handbook on the Law of Damages § 142, at 586 (1935). Normally, the plaintiff seeks reliance damages when unable to prove expectancy with reasonable certainty because "failure to prove profits will not prevent the party from recovering his losses for actual outlay and expenditure." *Behan*, 110 U.S. at 345, 4 S.Ct. 81.

■ Reliance damages are subject to the ordinary limitations upon contract remedies: causation, certainty, and foreseeability. Dobbs, *supra*, § 12.4, at 777–80. Defendant contends that plaintiff may not recover both on restitution and reliance. The Government cites two cases from this court in support of this proposition. *See Dolmatch Group, Ltd. v. United States*, 40 Fed.Cl. 431 (1998); *Pacific Architects & Eng'rs Inc. v. United States*, 203 Ct.Cl. 499, 491 F.2d 734 (1974). *Dolmatch* stands for the proposition that a "[p]laintiff cannot recover both expectancy and reliance damages on the same transaction." *Dolmatch*, 40 Fed.Cl. at 440. In *Pacific Architects*, the court found claiming restitution inconsistent with claiming anticipated profits. *Pacific Architects*, 203 Ct.Cl. at 516, 491 F.2d 734.

■ Plaintiff contends that it may recover restitution and non-overlapping items of reliance damages. "When a breach occurs after the execution of the contract, the injured party in a contract action is entitled to both restitution and reliance damages." *CBS, Inc. v. Merrick*, 716 F.2d 1292, 1296 (9th Cir.1983). The Restatement would allow recovery of restitution and, for example, "damages to compensate him for costs of transportation of goods that he has incurred." Restatement (Second) of Contracts § 378 cmt. d (1981).

## III. Expectancy

■ Expectancy damages give the plaintiff the "benefit of the bargain." E. Allan Farnsworth, *Contracts* § 12.1, at 840 (2d ed.1990). The expectation interest is determined by

measuring the actual value that the contract would have had to the injured party had it been performed, not on the injured party's hopes at the time the contract was made. *Id.* at 841.

To recover lost profits for breach of contract, the plaintiff must establish that: (1) the loss is the proximate result of the breach; (2) the loss of profits caused by the breach was within the contemplation of the parties because the loss was foreseeable or because the defaulting party had knowledge of special circumstances at the time of contracting; and (3) a sufficient basis exists for estimating the amount of lost profits with reasonable certainty. *Chain Belt Co. v. United States,* 127 Ct.Cl. 38, 115 F.Supp. 701, 714 (1953).

Because often many factors combine to produce the result complained of, the causation prong requires the injured party to demonstrate that "the defendant's breach was 'a substantial factor' in causing the injury." Corbin, *supra,* § 999, at 25. The foreseeability prong may be satisfied in two ways. First, the breaching party may actually have foreseen the consequences of a breach. *Chain Belt,* 115 F.Supp. at 714. Second, the injured party may show that the consequences of the breach were foreseeable "in the ordinary course of events" even if unforeseen by the defendant. Restatement (Second) of Contracts, § 351(2)(a) (1981). "[T]he test is an objective one based on what he had reason to foresee." Restatement (Second) of Contracts, § 351 cmt. a. (1981). The damage amount is proven with reasonable certainty "if the evidence adduced enables the court to make a fair and reasonable approximation of damages." *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960).

5. The figure for Southeast is net of a $9 million assistance payment received by California Federal from the Government.

6. This represents the fair value of Brentwood's net liabilities plus $44 million in mutual capital certificates issued by California Federal.

7. Plaintiff contended before trial that its net cost was $412 million, but reduced the amount dur-

DISCUSSION

I. Assumption of Liabilities

Plaintiff assumed the assets and liabilities of Brentwood and Southeast in exchange for defendant's promise to count plaintiff's goodwill as capital for regulatory purposes and to amortize it over a forty-year period. Plaintiff contends that its assumption of these liabilities was a cost incurred for which it should be reimbursed. According to plaintiff, the net liabilities assumed in the Southeast and Brentwood transactions were $305,672,000 [5] and $314,630,000,[6] respectively. Plaintiff values the benefits that it received from the contracts at $209,000,000. This leaves net damages of $409,000,000.[7]

Plaintiff asserts that the $409 million cost was foreseeable at the time of contracting because the Government expected Cal Fed to assume Southeast's and Brentwood's liabilities, pay them over time, and operate the institutions in accordance with its business plan.[8] According to plaintiff, these liabilities were paid as they came due. Plaintiff contends that it did not recoup the initial cost associated with the acquisition of the failing thrifts.

The assumption of liabilities is a cost. For example, taking over the accounts payable of a business would be part of the consideration for its purchase. Assuming a seller's mortgage would be part of the consideration for buying a house. Liabilities in this case are in the form of deposits. They represent liabilities to a bank because they are obligations that must be paid to a depositor on demand. Banks use deposits to leverage and grow; they are "the primary source of a thrift's franchise value," according to plaintiff's expert Professor Horvitz. We can foresee circumstances in which assumption of deposits would be a real cost that would fit one of the damages theories described above, but they

ing trial to account for additional post-acquisition earnings.

8. Cal Fed submitted a business plan to the Federal Home Loan Bank Board prior to acquiring the failing institutions. This plan explained Cal Fed's strategy for turning the failing thrifts into healthy institutions.

were not a cost to this plaintiff. Cal Fed did not prove that its agreement to take over loans and deposits from Southeast and Brentwood was a cost in the circumstances of this case.

Plaintiff assumed net liabilities because high interest rates reduced the value of the assets it received. The effect of purchase accounting principles caused the value of these assets (loans) to be discounted from their face value. Interest rates fell after the parties entered the contract. Plaintiff was able to sell some loans and reinvest the proceeds, generally operating the bank profitably as a going concern.

Plaintiff argues that the fall in interest rates did not restore profitability to the failing thrifts for several reasons. *See* PX 1164, "Reasons Why the Decline in Interest Rates did not Solve the Problem." First, plaintiff claims that it sold many of the purchase accounting loans acquired in the Southeast/Brentwood transactions. Because it sold many of its loans prior to the fall in interest rates it did not get to take full advantage of these falling rates.

Cal Fed's decision to sell some of the loans it acquired was based on prudent business judgment. It devised a loan portfolio that it thought would be most profitable. Cal Fed sold "slightly less than 30 percent of the loans," according to Dr. Hamm. It held on to the other 70% until after the rates had fallen and when the market value of those loans were restored to par. Of the loans it sold, Cal Fed reinvested the proceeds. These were good management decisions.

Plaintiff would benefit from the fall in interest rates with respect to those loans sold if it reinvested the proceeds in fixed rate loans. Dr. Hamm noted, "[t]o the extent Cal Fed continued to invest in fixed rate loans, it would restore its ability to benefit from a continued fall in interest rates. . . ." While Cal Fed complains that it sold 30% of the loans before interest rates fell, it did reinvest the proceeds from those sales. Cal Fed did not sell any loans during 1984–1986. By mid–1986 the loans were restored to their book value.

Proceeds of the loans that Cal Fed sold were reinvested, and plaintiff did not show that these reinvested proceeds lost money. Plaintiff did not isolate the performance of the reinvested proceeds in its analysis. Cal Fed continued to purchase fixed rate loans in 1982, 1983 and 1984.

When interest rates declined, the net liabilities disappeared. Cal Fed would not have survived had interest rates stayed at the high levels of the early 1980's; hardly anyone in the industry would have survived, according to Dr. Croft, a former regulator. Cal Fed paid the net liabilities as they became due, as plaintiff often argued, but it did so "initially by taking in deposits from other customers, but ultimately, it paid them out of the acquired assets. So there were no net liabilities. The acquired loans produced the income or revenue needed to honor the liabilities." These are crucial facts established through the testimony of Dr. Hamm. Cal Fed did not present convincing evidence to the contrary.

Second, plaintiff asserts that the decline in interest rates did not solve the problem because the institutions Cal Fed acquired had negative net interest income at the time of the acquisition. Plaintiff contends that Dr. Hamm's opinion that the negative spreads on the Brentwood and United loans originally acquired disappeared by mid–1983 is misleading because he based his analysis upon changes in the 6–month Treasury yield instead of Cost of Funds Index. After Cal Fed acquired the failing institutions in mid–1983, the acquired loans were generating funds to cover the acquired deposits. The correct interest rate to measure the fall in deposit costs is the six-month Treasury yield, not the COFI according to defendant. This is because the six-month Treasury yield is a pure interest rate, whereas COFI is affected by other factors.

The fall in interest rates more than solved the problem. The rates "fell well beyond the point needed simply to achieve a break-even status," according to Dr. Hamm. Because of the fall in interest rates and the length of time they stayed below the initial negative operating spread, Cal Fed had time to generate income on the acquired assets to compen-

sate for the period of time it was incurring losses and having to take on more interest-bearing liabilities to finance the losses.

The Cost of Funds Index does not reflect the true benefits derived from a fall in interest rates. According to Dr. Hamm, economically insolvent institutions searching for a way to expand put on nondeposit liabilities that were expensive in a high interest rate environment. These liabilities tended to "keep up" the cost of funds index, causing it to be higher than it should. Moreover, if California institutions changed the maturity structure of their liabilities, that would have an impact on the cost of funds index. This would reduce its value as a measure of the benefits plaintiff received from the fall in interest rates.

The initial net negative spread was eliminated by late 1983, and during the next three years interest rates continued to fall. This provided Cal Fed with the ability to make more profits to offset any initial losses that it may have incurred. The six-month Treasury yield was an appropriate measure to use for interest rates, and plaintiff was compensated for the initial negative net interest income.

Third, plaintiff argues that it diversified into new lines of business that were not as sensitive to interest rate fluctuations, so it did not receive any benefit from the decline in interest rates. Cal Fed did diversify its holdings, but this does not entitle it to damages. Diversification is irrelevant to whether the fall in interest rates solved the problem. If Cal Fed had losses as a result of selling fixed-rate loans, the decision to sell was based on management decisions. The losses are not a result of the breach and are not costs of acquiring the institutions. Moreover, Cal Fed does not provide evidence of profits or losses on the reinvested proceeds. Such damages are based on pure speculation.

### A. Insolvent on a Mark-to-Market Basis

Defendant contends that plaintiff's assumption of Southeast and Brentwood liabilities was not a cost because Cal Fed was insolvent on a mark-to-market basis. Cal

Fed had no tangible capital with which to pay the acquired liabilities so they could not have been a cost incurred by plaintiff, according to defendant. Plaintiff was insolvent by $1.6 billion in February 1982 and $1.1 billion in October 1982. Defendant asserts that Cal Fed's insolvency meant that it took no risk when it acquired these institutions; it made no economic investment.

Plaintiff argues that its solvency when it entered into the contracts with the Government in 1982 is irrelevant. The Government reasonably concluded that Cal Fed would pay the acquired institutions' liabilities as they came due, according to plaintiff. It is plaintiff's argument that a mark-to-market analysis does not measure the ability of a thrift to pay liabilities over time. Rather, a "going concern" analysis better measures a thrift's ability to pay off liabilities. Plaintiff's experts testified that Cal Fed had "going concern" value in 1982.[9]

Plaintiff's expert Dr. Horvitz was questioned extensively about Cal Fed's ability to pay liabilities of the acquired institutions if Cal Fed was actually insolvent on a mark-to-market basis. Dr. Horvitz eventually stated that he had not made that calculation. He conceded that "the majority of institutions were at least to some extent mark-to-market value insolvent during the period."

While Cal Fed may have been insolvent on a mark-to-market basis, we agree that it is irrelevant for determining damages in this case. Plaintiff was not required to pay all of the liabilities of the acquiring institutions at one time. They were paid as they came due. Plaintiff may not have been able to pay off all of the deposits of the acquired institutions had every depositor requested his or her money back on the same day, but it could and did pay the deposits back over time.

### B. Operating Costs

Plaintiff contends that it is entitled to the costs of operating the Southeast and Brentwood institutions because such costs were reasonable and foreseeable. The Government approved Cal Fed's business plan and

---

9. Going Concern value is "the opportunity to earn future profits," according to Professor Horvitz.

encouraged its strategy to reduce interest rate risk, plaintiff argues, so defendant is liable for those costs.

We are not persuaded that the contracts required California Federal to operate these banks in accordance with any Government plan. The Supreme Court ruled that the United States was contractually obligated to permit financial institutions to apply special accounting treatment with regard to the acquisitions of failing thrifts. *United States v. Winstar Corp.*, 518 U.S. 839, 848, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The contract in this case consists of numerous documents. Nothing in the contract suggests that the Government could in any way control plaintiff's operation of the institutions. The failing institutions were to be "merged" into California Federal Savings and Loan. Neither the Federal Home Loan Bank Board nor the regulators could dictate Cal Fed's business decisions with respect to those institutions.

A witness who was president when the contracts were entered into testified that the regulators never told him how to operate the institutions or what assets to buy, sell, or retain. They did not tell Cal Fed itself what liabilities to buy, sell, or retain. Dr. Croft, the former director of the Office of Examinations and Supervision at the Federal Home Loan Bank Board, testified that thrifts were encouraged to be "proactive" but they were not guaranteed a profit. He testified that the thrifts were not guaranteed they would grow or that if they engaged in different lines of businesses and lost money that the Government would underwrite those losses.

It was foreseeable at the time of contracting that Cal Fed would pay the acquired institutions' liabilities as they came due, but it was not foreseeable that the Government would be responsible for losses arising from operating the institutions in accordance with Cal Fed's business plan. When the Government approved Cal Fed's business plan it did not insure Cal Fed against all losses arising from that plan. Plaintiff merely informed the regulators that it had a plan to turn these failing thrifts into profitable ones.

While Cal Fed did have to pay the operating costs of the acquired institutions, the interest rates fell far enough to fund those costs. Dr. Hamm testified that plaintiff's damages model takes into account virtually every business decision that Cal Fed made between January 1983 to the present day. He stated, for example, "every time Cal Fed writes a check that affects either Brentwood's costs or Southeast's costs ... [or] decides to run an advertisement in Southern California ... that's going to cause the profits attributed to Brentwood to go down." As Dr. Hamm points out, under plaintiff's model if Cal Fed decides to double the employees in the mergers and acquisitions department for the Southeast institutions, it would cause Southeast's costs to go up. These wholly unrelated business decisions cannot be linked to plaintiff's assumption of the acquired institutions' liabilities.

Plaintiff's expert Mr. Taylor calculated Southeast's and Brentwood's net costs. He took operating expenses that could be booked to the Southeast division and then added an additional $234 million of expenses that were booked to the California division. Defendant asked whether Cal Fed would have saved $234 million in expenses if the Southeast acquisition had not happened. He responded, "I guess I do know that they would have saved money. I don't know what amount it would have been." We cannot base damages on pure speculation.

Mr. Taylor determined Brentwood's net costs for the 1983–1998 period by allocating to Brentwood 10.4% of the accretion income. This was based on his determination that Brentwood held 10.4% of Cal Fed's California deposit base. Plaintiff believes that deposit share was the best basis for apportioning net income between Brentwood and Cal Fed.

Defendant contends that Cal Fed's failure to credit Brentwood with accretion from Brentwood loans in measuring Brentwood's profitability is improper. The accretion relates solely to the Brentwood loans and not to other Cal Fed loans. Correcting this error results in a net benefit to Cal Fed rather than a loss.

The purpose of apportionment is to measure the separate contributions of Brentwood and Cal Fed as a means of crediting the

Government with benefits Cal Fed received from the contract. Dr. Hamm testified that "deposits are not a reliable predictor of branch profitability." While deposits can be a factor in determining the profitability of a thrift, they are not the determining factor. Dr. Hamm stated that many thrifts have mediumly or below average deposit bases yet "are among the most profitable in the system because they have a low-cost structure ... [or] produce a lot of revenue in the form of cross-selling to customers on assets or products offered by the company."

### C. Investment Income

■ Plaintiff argues that the Southeast and Brentwood mergers provided cost savings to the FSLIC and thus substantially reduced the risk to the insurance funds. In doing this, the Government saved millions of dollars that they would have had to pay out to liquidate these failing thrifts. According to plaintiff, the benefit that the Government received was the investment income that the Government was able to earn on the funds the FSLIC retained as a consequence of Cal Fed's performance.

Defendant contends that the Brentwood and Southeast institutions would not have been liquidated if Cal Fed had not acquired them. The Federal Home Loan Bank Board policy was to "ride out" the period of high interest rates and help savings and loans appear healthy, according to defendant. Options available to the FHLBB were approving acquisitions, reducing capital requirements, offering direct assistance, and issuing income capital and net worth certificates. Various accounting measures also allowed some thrifts to remain open. Defendant argues that it would not have been necessary to liquidate.

The Government had not made a decision to liquidate Brentwood or Southeast at the time of contracting with Cal Fed. It had several alternatives to liquidation available. The failing thrifts became profitable, as did Cal Fed. But no one knew this would be true at the time the contracts were executed. Plaintiff could have failed and FSLIC would have been responsible for paying off deposits for Cal Fed, Brentwood and the Southeast institutions. The disgorgement theory offered by plaintiff was not convincing.[10]

If plaintiff ultimately profited from assuming the liabilities of the failing institutions, then any damages awarded to plaintiff based on its assumption of those liabilities would be a windfall. For that reason, it would be improper for this court to look solely to the day of contracting to determine damages. Here, the fall in interest rates more than covered any costs plaintiff incurred in assuming the liabilities of the failing thrifts.

### II. Wounded Bank Damages

■ Plaintiff seeks about $285 million in "wounded bank costs" arising from the breach. To justify award of such costs, plaintiff must show that they resulted "inevitably and naturally, not possibly nor even probably the breach." *Myerle*, 33 Ct.Cl. at 27. Instead, plaintiff merely added up its "Net Increase Cost of Deposits" 1991–1998, its "Net Increase Regulatory Costs" 1993–1998, and its "Net Increased Cost of Borrowing" 1992–1998, and charged the entire amount to the Government. We have nothing but conjecture to support the notion that all of these increased costs are attributable to the breach. Indeed, it would be a remarkable coincidence if all increased costs claimed by plaintiff in these categories were caused by the breach. During parts of these periods Cal Fed held over a billion dollars in nonperforming assets. Its prime lending area was suffering a severe recession. Its loan losses were substantial. In this case, $285 million in wounded bank costs is "too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit." *Myerle*, 33 Ct.Cl. at 26.

Plaintiff offered the testimony of Mr. Petitti who was Executive Vice President in charge of marketing operations for the bank 1992–1995. On direct, he discussed customer concerns about the bank's health as a result of the breach, and how the bank would deal

10. Defendant argues that these damages amount to impermissible pre-judgment interest, but it is not necessary to address that point.

with these concerns. He conducted special training sessions on how to respond to customers, for example. On cross, however, were the following exchanges:

Q: And do you contend that there were deposit outflows as a result of the problem institution designation? [11]

A: Yes.

Q: And what was the volume of the deposit outflows?

A: I can't give you a number.

Q: How significant was it?

A: I think it was significant, but I can't tell you that it caused an outflow on a particular day. I think it was a cumulative effect and it just added to the concern of the customer base.

Q: And what evidence do you have of that?

A: The reaction that people had and my memory of people coming in the branches with the articles, people closing accounts.

. . .

Q: Isn't it a fact that Cal Fed thought FIRREA was good news because FIRREA would cause liquidation of institutions that offer above market rates on deposits.

A: That's what this [Cal Fed Outlook Memorandum] says.

Q: So that's what Cal Fed was telling its people at the time, correct?

A: Yes.

Q: And Cal Fed was also predicting that FIRREA would actually restore the public confidence in the industry; isn't that correct?

A: Yes.

Plaintiff offered this additional testimony on redirect:

Q: Mr. Petitti, during the period 1990 through 1996, did you have personal conversations with Cal Fed depositors about their concerns about the Bank's viability?

A: Yes I did.

Q: In what context did you have those?

A: Well, I would, in the course of my responsibilities, I would visit branches, I would occasionally talk to customers. When I did that, I would also get calls from customers occasionally, and of course, I would have many conversations with the branch people themselves.

Such testimony does not provide a basis for awarding damages. Expert testimony on the point was not convincing. Even if the phase-out of goodwill as capital had *some* impact on the bank's costs of doing business, we would have to know that higher costs of deposits and other damages that plaintiff terms "wounded bank" were attributable to the breach. We think it far more likely that other factors caused the bank's problems, including its financial condition unrelated to the breach.

Much of plaintiff's case for higher costs of funds as evidence of wounded bank damages is based on changes before and after the breach in its comparative standing vis-a-vis other banks in the 11th district. However, its arguments in this regard were not convincing. The charts showing cost of funds over a period of years did not consistently show that the breach had an effect, or that any such effect could not have had an independent cause. Some of Cal Fed's highest costs of funds were during a period when it was well capitalized. One expert speculated that the bank would have been healthier after the breach had it not acquired the thrifts, Southeast and Brentwood, in 1982. While it is possible that this is so, we cannot make such a finding of fact. Any number of factors could affect a bank's capital ratio during a given period of time.

Plaintiff's arguments in several respects during this trial were harmed by its lack of supporting documentation in several respects. This was particularly true of the wounded bank issue. For example, one of plaintiff's experts, Dr. Smith, stated on cross that he had worked on this case for three years, but never had he seen a document in which the bank expresses concern about the

11. We could not establish that the "problem institution designation" was caused by the breach.

effects of the breach on costs of funds or costs of deposits.

We were receptive to the notion that higher assessment fees, at least, could be attributed to any problems that the bank experienced after the breach with regard to its capital ratios and other indications of health. As in the case of most insurance, higher risk calls for higher premiums. Banks with higher MACRO [12] ratings pay higher assessments. Capital is only one element that goes into determining a bank's rating. A government regulator testified that asset quality was the element that weighed most heavily in determining Cal Fed's MACRO rating 1991–1994. Cal Fed's rating improved in 1994 as goodwill was being phased out. The government regulator, Mr. Buting, showed that problem assets were the main reason for Cal Fed's bad ratings earlier. In short, we cannot establish a connection between defendant's breach of the contract and plaintiff's costs of deposits, costs of borrowing, or regulatory assessments sufficient to find causation.

### III. Lost Profits

■ We held a number of pretrial hearings to discuss various aspects of how the trial would be conducted, and to deal with motions *in limine* and other matters. An important topic during these hearings was expectancy damages, and how they would be proved at trial. The parties briefed *Wells Fargo* and its meaning for our purposes, and we heard oral arguments on *Wells Fargo* and on expectancy damages generally. *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012 (Fed.Cir.1996), *cert. denied*, 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1997). In an October 9 Order, we stated that Cal Fed "should be prepared to show that the Bank was profitable in the years prior to the breach, and that it would have continued to make profits with the money that it lost .... We do not expect to hear testimony from experts concerning how the money might have been invested to achieve maximum profits." We directed plaintiff to submit "a concise list of lost profits claimed, along with

reference to [written business plans, board resolutions and minutes, and internal memoranda] that will support such profits."

After reviewing plaintiff's response to this Order, along with a lengthy Appendix that consisted mostly of business plans and related data, we ruled that Cal Fed would not be able to establish lost profits as a matter of law. A November 12 Order stated in part, "Defendant knew that breaching this agreement would cause plaintiff to adjust its capital ratio. That is, it knew that plaintiff would have to reduce its assets or increase its capital. But it could not foresee what effect this adjustment would have on plaintiff's profits. Banking was a volatile and dynamic business at the time of breach. These factors make expectancy damages particularly speculative. In these circumstances, plaintiff cannot prove clearly and with certainty that it would have made profitable loans and other profitable investments with the 'lost' capital. The Government promised to permit the use of goodwill as capital, but it did not guarantee plaintiff that its use of the additional leverage would be profitable."

The cases that everyone cites on the issue of lost profits, other than *Wells Fargo*, are *Neely I*, *Neely II*, and *Chain Belt. Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438 (1961)(*Neely I*); *Neely v. United States*, 167 Ct.Cl. 407, 1964 WL 8619 (1964)(*Neely II*); *Chain Belt Co. v. United States*, 127 Ct.Cl. 38, 115 F.Supp. 701 (1953). Both parties here cited them as support for their positions. *Neely I, Neely II* and *Chain Belt* are among the very few cases on lost profits that were decided against the United States. It is instructive, therefore, to see how those cases differ from others in which plaintiffs were not successful, and from this one.

In *Neely I*, the Government breached its agreement to allow plaintiff to strip-mine certain lands for coal. Anticipated profits "is a recognized measure of damages, where their loss is the proximate result of the breach *and the fact that there would have been a profit is definitely established*, and there is some basis on which a reasonable

---

**12.** The MACRO rating is based on five factors that indicate the health of a financial institution. These are Management, Asset Quality, Capital, Risk Management/Liquidity, and Operations/Earnings.

estimate of the amount of the profit can be made." *Neely I*, 285 F.2d at 443, (emphasis added). The court discussed how difficult it is to establish lost profits in that "profits are uncertain; they depend on so many contingencies, especially in a new enterprise, that it is, in most cases, impossible to say that the breach was the proximate cause of the loss of them, or that a profit would have been realized, in any event: nor is there any basis to determine what they might have amounted to. This is especially true where the breach occurred before operations had begun." *Id.*

The court pointed out however that here "some four or five years after the breach, the leased lands were actually strip-mined and 132,000 tons of coal were extracted .... [T]he profit realized from these operations, if, indeed, there were profits, would furnish some basis for a fairly reliable estimate of what plaintiff's profits would have been." *Id.* The court remanded the case to obtain a reasonable basis for making such findings. On remand, the trial court discussed the "problem of attempting to determine what would have happened if the plaintiff had been permitted to strip-mine ... in accordance with his desire." *Neely II,* 167 Ct.Cl. at 407. However, defendant in that case conceded that the plaintiff, "if he had been permitted to strip-mine the 2162.71 acres of public land ... could reasonably have made profits totaling $154,446.97." *Id.*

Note the important differences between this case and ours. The numbers are exact. In *Neely I,* we find that 132,000 tons of coal actually were extracted from that tract (exactly 2162.71 acres). The trial commissioner was able to deduct 28,000 tons of coal that lay beneath the roadways, which plaintiff would not have been to obtain permission to relocate. Such precise information permits a determination of damages through simple mathematical calculations. The efforts that the Court of Claims and the Trial Commissioner made to determine a precise figure establish how difficult it is to prove lost profits against the United States. Even though they are cited by the plaintiffs in this case, *Neely I* and *Neely II* do not support their highly speculative theory of lost profits.

In *Chain Belt,* the Government breached its agreement to remove machinery from plaintiffs premises on the date agreed. Plaintiff sued on several grounds, including lost profits. That is, "plaintiff was prevented from making profitable use of the floor space so occupied for the period of such delay .... Even in the case of an established business it is only possible to estimate the amount of profits that would have been earned if the contracting question had not been breached, but the courts will make that estimate if a reasonable basis therefor is provided." *Chain Belt,* 115 F.Supp. at 714–716. "In our opinion it is reasonable to conclude from the evidence of record ... that the additional capacity of plaintiff's new plant would have resulted in increased earnings approximately equivalent to the earnings realized by plaintiff from its other manufacturing facilities." *Id.* at 718.

Once again, the detailed damages information available to the court in that case is striking by comparison to ours. Plaintiff established its sales for the ten-year period previous to the breach, and proved a profit ratio on sales "of approximately 17.8%." *Id.* at 719. The court knew exactly what the total productive floor area of plaintiff's plants was (597,645 square feet) and was able to establish plaintiff's net profit per square foot ($0.0118). "The total productive floor space in a new building, denied to plaintiff for the 67 days, consisted of 208,040 square feet." *Id.* at 719–720. Therefore the court established that "plaintiff lost $91,761.78 in profits during the 67 days it was delayed by defendant from having the use of the 116,066 square feet of plant, figured on the basis of $0.0118 per square foot as profit for each calendar day of delay." *Id.* at 720.

In *Penn Foundry,* the court allowed anticipated profits because of defendant's breach of contract. The Supreme Court reversed because plaintiff did not have the capital, know-how, and necessary trained employees to complete the contract. *Penn Foundry & Mfg. Co. v. United States,* 110 Ct.Cl. 374, 75 F.Supp. 319, *rev'd,* 337 U.S. 198, 69 S.Ct. 1009, 93 L.Ed. 1308. Therefore, the Government's breach was not the direct cause of plaintiff's failure to earn profits. While we

do not question plaintiff's management know-how or the training of its employees, this case does highlight the difficulty of proving profits against the United States. Breach does not automatically equal damages; other factors are taken into consideration.

## IV.   Replacing Goodwill

### A.   Shrinking the Bank

When goodwill was phased out as capital, plaintiff had two options for meeting its capital requirements. It could raise new capital to support the assets it had, or it could reduce its assets to a level that current capital would support. Cal Fed asserts that the loss of goodwill as capital forced it to shrink the bank to meet its capital ratios.

It is clear from the testimony presented at trial that Cal Fed sold off assets and shrank in size. The cause of this shrinkage is unclear. Cal Fed suffered significant losses due to the California real estate recession and it saw an increase in nonperforming assets. It is possible shrinking the bank was a result of these losses. Plaintiff did not prove that shrinking the bank was a result of the breach, or even that it was harmful. It may have been the result of prudent management decisions.

### B.   Goodwill is Not Capital

Plaintiff argues that its loss of goodwill as capital was a cost for which it should be reimbursed. However, goodwill is not a cost that should be reimbursed dollar for dollar. Cal Fed quantified goodwill on its books and used that number to meet its capital requirements. While goodwill was used as capital for those purposes, it is not equivalent to capital and does not have a dollar for dollar value. It could be used to meet capital requirements only because the Government said so. Supervisory goodwill was merely an accounting gimmick, used by Cal Fed to meet its federal capital requirement and to keep the regulators at bay.

Goodwill kept the regulators at bay only with regard to Cal Fed's capital ratios, however. The regulators monitor other factors related to a bank's health, and they could have faulted Cal Fed in other areas. Mr. Buting, a government regulator for the Office of Thrift Supervision, testified that OTS performs examination reviews on thrifts that are in capital compliance to determine if they are "operating prudently and safely and soundly." Even though a thrift may meet capital requirements, it can be "taking all kinds of risks, making loans without appraisals, for instance, not following underwriting procedures, not having internal controls. They could have all types of activities that could jeopardize that status, so we would want to be in there every year to look and make sure that that's not the case." The only value that supervisory goodwill had for Cal Fed was its being counted toward core and risk-based capital requirements, according to Mr. Buting.

Goodwill was recognized as an accounting gimmick by the Supreme Court in *Winstar*. The Supreme Court explained that one of FIRREA's purposes was to "eliminat[e] the very accounting 'gimmicks' that acquiring thrifts had been promised." *Winstar*, 518 U.S. at 841, 116 S.Ct. 2432. The concept of goodwill was explained by Dean Fischel of the University of Chicago Law School and director of the law and economics program at the University of Chicago. He testified:

> Supervisory goodwill is an accounting concept which banking regulators in the 1980s allowed savings and loans to use as an alternative to real capital for purposes of meeting capital requirements. It's frequently referred to as one of many different forms of accounting gimmicks which allowed insolvent or close to insolvent institutions to appear solvent for regulatory purposes, even though as an economic matter, they had insufficient capital to be able to meet the then-existing capital requirements.
>
> * * * *
>
> It's not a real asset. A real asset is an asset that you earn an economic return on, like either a stock or a bond or a piece of land, or anything real where you have an expectation of appreciation, either in the form of interest, dividend payments, capital gains; any type of economic return along those lines. But because supervisory goodwill is an accounting fiction, it's not real. You earn no economic return on something that's not real.

So goodwill is not equivalent to capital; it is a unique bookkeeping entry with no clear equivalent. It is an accounting plug.

When Cal Fed's goodwill was taken away by FIRREA, plaintiff replaced it with real capital. Cal Fed is not entitled to the capital equivalent of goodwill because that amount is far greater than any damages that plaintiff proved at trial. The breach forced Cal Fed to replace its goodwill with capital, and the damages suffered by Cal Fed are the costs of that replacement.

## V. Replacement Costs

■■■ Plaintiff was required to phase out goodwill from its books much faster than its contract provided because of defendant's breach. This forced Cal Fed to replace the goodwill with "real money" to meet capital requirements. Cal Fed was successful in replacing its goodwill, and in fact never fell out of capital compliance. The costs of raising replacement capital are the damages that we award by this opinion, and the subject of this section.

The Government argues that plaintiff is entitled only to the transaction costs involved in replacing the goodwill that was phased out by its breach. Because Cal Fed replaced goodwill by flowing money down from its holding company, such costs were very limited, according to defendant, about $1.5 million. Plaintiff contends that the holding company flow-down did not replace the lost goodwill. Cal Fed raised capital through various stock transactions and it is entitled to the costs of those transactions. Plaintiff includes in these costs the cost of repurchasing the issued stock to eliminate the need to pay dividends.

We agree with the defendant in part and plaintiff in part. Cal Fed is entitled to the transaction costs of replacing goodwill, but those transaction costs are derived from raising money in the capital market, not from flowing down money from the holding compa-

ny. It does not matter whether plaintiff chose to transfer the needed capital from its holding company or raised it in the capital markets.

### A. Flow-down from the Holding Company

In 1989 and 1990 Cal Fed's holding company transferred over $200 million to Cal Fed. Plaintiff argues that this flow-down was planned prior to FIRREA and was intended to give Cal Fed a 2% cushion over the federal capital requirement. Plaintiff states that it was Cal Fed's policy to have such a cushion. The Government contends that this flow-down replaced the phased out goodwill and that there were minimal transaction costs involved with this flow-down because Cal Fed merely took money from one pocket and placed it in another pocket.

The purpose of this flow-down is irrelevant. The Government's breach resulted in the elimination of Cal Fed's supervisory goodwill. Cal Fed is entitled to what it would cost to replace that goodwill in the capital market. The Government is responsible for the cost of replacing goodwill with new capital, not with Cal Fed's own assets.

### B. Cost of Replacing Goodwill with New Capital

Cal Fed raised a significant amount of new capital through a series of financial transactions. These include a restructuring in 1992, a convertible preferred stock offering in 1993, and a rights offering in 1994. These were the first three capital transactions after the breach occurred. Plaintiff's expert, Professor Pfleiderer used these market transactions to calculate the cost of replacing goodwill. We have used this model for determining the cost of replacing goodwill with new capital raised in the capital market. These ventures raised more than $400 million in capital, an amount sufficient to replace the $390 million in goodwill that Cal Fed had to discount.[13]

---

**13.** According to defendant the 1992 restructuring raised approximately $151 million in new capital for Cal Fed, the 1993 convertible preferred stock offering raised approximately $89 million in new capital, and the 1994 rights offering raised approximately $183.3 million in new capital. Plaintiff's expert testified that the 1992 restruc-

turing raised $151 million in new capital, the 1993 convertible preferred offering raised $93.5 million, and the 1994 rights offering raised $194.8 million in new capital. The difference appears to be that defendant netted out the transaction costs.

The costs of these transactions are the damages suffered by Cal Fed from the Government's breach. These are flotation costs, including fees for underwriters and lawyers. Any amounts greater than these expenses would be more than necessary to make Cal Fed whole; we are not permitted to award them.

One of plaintiff's experts testified that the cost of replacing $390 million of goodwill—an accounting entry with no value other than to keep regulators at bay—was nearly a billion dollars. We could not determine that such testimony was credible. These inflated costs arose partly from the theoretical repurchase of all outstanding stock by the bank to eliminate the cost of paying dividends.

The Government's expert witness on the matter, Dr. Miller, a Nobel prize winning economist, explained that such a theory is absurd. He testified that in finance, you take the cost of issuing stock the day it is issued. On the day stock is issued, the amount you receive for the stock is equivalent to its worth and the only costs are transaction, or flotation costs. Dr. Miller also points out that raising capital had benefits for Cal Fed beyond merely replacing supervisory goodwill. For example, new capital allowed for investment and risk sharing.

Plaintiffs are entitled to transaction costs determined by the costs of the 1992 restructuring, the 1993 convertible preferred stock offering, and the 1994 rights offering. These three transactions raised enough capital to replace the supervisory goodwill taken away by FIRREA. We believe that this model represents the real cost of defendant's breach to plaintiff.

The costs that comprise this judgment include costs incurred by both Cal Fed and its holding company. Defendant argues that only the costs incurred by Cal Fed should be included. The Government treated the two entities as the same, however. It argued that transferring money from the holding company to the bank was "taking money from the left pocket and putting it in the right pocket." In any event, the holding company merged into the bank. Defendant's expert calculates the transaction costs for the 1993 convertible preferred stock offering at $4.5 million and the transaction costs for the 1994 rights offering at $11.7 million. Plaintiff's witness, Mr. Wallis, is in agreement more or less. He testified that the exact transaction costs were $4,298,519 and $11,514,778, respectively.

Transaction costs necessary to raise enough new capital in the capital market to replace goodwill total $22,966,523.42. These are plaintiff's damages.

## CONCLUSION

This case has been difficult to analyze in the context of normal common law damage theories. The parties essentially contracted to call liabilities "assets" and used them to improve the bank's apparent health. It was really an agreement by the Government that its regulators would not write up the bank for weak capital ratios if the bank would take on net liabilities from failing thrifts. In fact, all that we could determine from witnesses on both sides concerning the value of this contract was "it would help keep the regulators off our backs."

We expected to find out-of-pocket expenses or other real losses from this breach. But testimony over a period of six weeks from expert witnesses and from the fact witnesses whom we found to be persuasive, did not establish that this plaintiff was damaged in any normal, legal sense of the term. Only a form of disgorgement theory would permit us to award substantial damages to plaintiff in this case. That is, the United States received immediate benefit from the contract measured by the net liabilities assumed by plaintiff on the day that the contract was signed, and plaintiff is awarded that amount. This would not take into consideration anything that happened during the seven years that the contract was performed by both parties. Such damages would be punitive, and that is not the purpose of contract remedies. Moreover, they would not be representative of the relationship between the contracting parties. They would not have been foreseeable. They would be an impermissible windfall to plaintiff.

The United States temporarily transferred its responsibility for the net liabilities of cer-

tain failing thrifts to plaintiff; that is true. But it remained responsible for those liabilities as if the contract never had been executed. Were it not for falling interest rates, the United States probably would have had to make those liabilities in the form of deposits good. Plaintiff benefitted from the fortuity of falling rates as did the United States. Credible expert testimony established that plaintiff would not have survived further increases in interest rates during those years. In fact, we determined that further increases in rates would have been calamitous to the entire industry. It is very likely that practically all thrifts would have failed. Defendant argues that regulators were merely "buying time" by their negotiations with relatively healthy thrifts, putting them together with those that were failing. They were betting that rates would come down and everyone would survive without having to tap the insurance fund. This argument may sound unlikely, but no one testified credibly of any other purpose that seemed logical.

The facts of this particular case do not establish that plaintiff suffered monetary loss beyond its expenses of raising new capital to replace the phased-out goodwill. Damages are determined by the value of what it would have cost plaintiff to replace the goodwill on the open market. That amount is $23,353,226.42.

The Clerk will enter judgment for plaintiff in the amount of $23,353,226.42. No costs.